# United States Court of Appeals

## For the First Circuit

No. 03-1758

ROSEN CONSTRUCTION VENTURES, INC., a Florida corporation, and
ACROPOLIS VENTURES, INC., a Florida corporation,

Plaintiff, Appellants,

v.

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C.,
a Massachusetts corporation,
STEPHEN M. LEONARD, individually, and
STEPHEN T. LANGER, individually,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before
Selya, Circuit Judge,
Coffin, Senior Circuit Judge, and
Lipez, Circuit Judge.

Alan J. Kluger, with whom Steve I. Silverman and Kluger,
Peretz, Kaplan & Berlin, P.L., were on brief, for appellants.
Robert S. Frank, Jr., with whom John R. Baraniak, Jr.,
Kathleen A. Burdette, and Choate, Hall and Stewart, were on brief,
for appellees.

April 16, 2004

**LIPEZ**, **Circuit Judge**.   Plaintiffs Rosen Construction Ventures, Inc. and Acropolis Ventures, Inc., owned by Clifford Rosen, (collectively, "Rosen") filed a legal malpractice action against Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., and two members of that firm, Stephen Leonard and Stephen Langer (collectively, "Mintz Levin").   Rosen alleges that Mintz Levin was negligent in drafting a contract between Rosen and O'Donnell Sand & Gravel, owned by Mary O'Donnell (collectively, "O'Donnell" or "ODSG"), and in failing to properly advise Rosen about certain easements it required on the O'Donnell property.

Mintz Levin moved for summary judgment in August 2000, arguing that Rosen's claims were barred by the three-year statute of limitations for legal malpractice actions.  Mass. G. L. ch. 260, § 4 (2003).  In March 2001, the district court denied that motion, holding that there was a disputed issue of fact about the duration of Mintz Levin's representation of Rosen.  One year later, while discovery was ongoing, the Massachusetts Supreme Judicial Court decided <u>Lyons</u> v. <u>Nutt</u>, 436 Mass. 244 (2002), a case that clarified the continuing representation doctrine applicable to legal malpractice actions.

In February 2002, Mintz Levin again moved for summary judgment, citing the <u>Lyons</u> decision and evidence procured during discovery.  In response, the district court held that "[t]he issue is not . . . when Rosen thought that it might have a malpractice

-2-

claim against Mintz Levin, but rather when it knew it was harmed as a result of Mintz Levin's conduct." The district court then granted Mintz Levin's second summary judgment motion, holding that Rosen actually knew that its harm was the result of Mintz Levin's conduct more than three years before it filed its malpractice action against Mintz Levin.

In evaluating Rosen's appeal from this summary judgment ruling, we must determine whether there is a genuine issue of fact regarding when Rosen's malpractice claim accrued -- that is, when Rosen knew, or should have known, that Mintz Levin's alleged malpractice was the source of Rosen's injuries. After reviewing the summary judgment record, we affirm in part and vacate in part the district court's decision.

## I.

We set forth the background facts here, reserving some of the details until the discussion of the issues on appeal. In August of 1994, Rosen Associates, a non-party to this case and a separate entity controlled by Clifford Rosen, the owner of Rosen Construction Ventures, Inc., agreed to purchase a parcel of land in Everett, Massachusetts from Monsanto Chemical Company and another related entity. Rosen intended to build a shopping center on this site, referenced by the parties as the "Development Site." The Development Site was contaminated, and the remediation plan called for a six-foot deep layer of clean fill to be spread over the

property. Because Rosen contracted for this remediation responsibility, it needed to obtain and store clean fill until it could be used on the Development Site.

O'Donnell, who had access to significant quantities of clean fill, owned land close to the Development Site. It had purchased this property from Boston Edison Co. (the "Edison Site") for $100,000 in cash and a $1.9 million note (the "Edison Note"). In early 1995, Rosen and O'Donnell negotiated an agreement relating to both the fill and certain aspects of the Edison Site. Rosen retained Mintz Levin to draft a contract that memorialized the arrangement between Rosen and O'Donnell. That written contract, which came to be known as the Fill Agreement, was dated April 19, 1995.

Among other things, the Fill Agreement provided that (1) O'Donnell would grant Rosen a three year 51% interest in the Edison Site as tenants in common, (2) Rosen could convert that temporary 51% interest into a maximum 50% permanent partial interest, depending on the extent to which Rosen negotiated a reduction in the principal of the Edison Note, and (3) O'Donnell would grant to Rosen, upon Rosen's request, a perpetual easement on the Edison Site to allow Rosen to construct road access to the Development Site. The portion of the Fill Agreement relevant to Rosen's rights to secure a permanent interest in the Edison Site -- Section 6(b) -- reads as follows:

[I]f Rosen, in its sole discretion, is able to negotiate with Edison a forgiveness of, or a reduction in, the principal amount due in order to obtain a discharge of the Edison Mortgage, below $1,900,000, then Rosen may retain, and shall not be required to reconvey to [O'Donnell], that undivided percentage interest (not to exceed 50%) in the Edison Site which is equal to (x) the amount of such principal forgiveness or reduction, divided by (y) Two Million Dollars ($2,000,000). For example, if Rosen were to negotiate a principal reduction of $250,000, then Rosen would be able to retain a 12.5% undivided interest, and if Rosen were to negotiate a principal reduction of $1,250,000, then Rosen would be entitled to retain a 50% undivided interest.

After signing the Fill Agreement in April, Rosen began negotiating with Boston Edison for a reduction in the principal amount of the Edison Note. At that time, the principal payment schedule for the Edison Note called for $100,000 monthly payments from May to September 1995, $200,000 payments in December 1995 and March and June 1996, and a final $800,000 payment in March 1998. Rosen attempted to secure at least partial forgiveness of the Edison Note in exchange for agreeing to purchase the electricity for the planned shopping center on the Development Site from Boston Edison. At one point, Boston Edison offered a $640,000 reduction in the Edison Note, which Rosen did not accept. In the end, Rosen and Boston Edison never finalized a reduction in the outstanding Edison Note balance.

On April 2, 1996, almost one year after the Fill Agreement was signed, O'Donnell paid off the outstanding balance of

the Edison Note and obtained a discharge of the mortgage on the Edison Site. The next day, O'Donnell verbally informed Rosen of its actions. During the following week, O'Donnell advised Rosen that, in its view, the full payment of the note terminated Rosen's right to acquire a permanent interest in the Edison Site under the Fill Agreement.

Rosen disagreed with O'Donnell's interpretation of the Fill Agreement, claiming that its right to obtain a permanent interest in the Edison Site had not been terminated and that O'Donnell's prepayment of the note and its position on the issue were "calculated to interfere with a right [Rosen] had bargained for in good faith." O'Donnell responded that Rosen's position was "preposterous" and that O'Donnell's decision to satisfy its obligations on the Edison Note at that time was permitted by the Fill Agreement. O'Donnell also wrote that "[n]owhere is it stated that O'Donnell is prohibited from early satisfaction of our financial obligations." During April and June of 1996, Rosen and O'Donnell exchanged increasingly heated letters setting forth their respective positions, and eventually they reached an impasse.

In June 1996, Rosen asked Mintz Levin to draft a complaint for use in an impending civil action against O'Donnell, and Mintz Levin complied. When Mintz Levin would not agree to handle the case on a contingency fee basis, Rosen consulted with Boston attorney Albert Farrah, who agreed to take the case on

contingency. Rosen filed suit in Massachusetts state court in November 1996, alleging that O'Donnell's pre-payment of the Edison Note breached the Fill Agreement. In April 1998, the state court granted O'Donnell's motion for summary judgment. Two months later, the Massachusetts Appeals Court affirmed the summary judgment ruling.

Following this adverse decision in its suit against O'Donnell, Rosen claimed that Mintz Levin had been negligent (1) in failing to draft the Fill Agreement to protect Rosen's right to secure a permanent interest in the Edison Site and (2) in failing to timely secure an easement for Rosen and perform sufficient due diligence regarding the status of an existing easement on the property. On October 14, 1999, Rosen and Mintz Levin entered into a "tolling and standstill" agreement that tolled the statute of limitations for any claim of Rosen's against Mintz Levin that accrued after September 2, 1996. If Rosen's claims accrued prior to that date, they would be barred by the applicable Massachusetts statute of limitations.

On January 25, 2000, Rosen filed this legal malpractice action against Mintz Levin. In granting Mintz Levin's summary judgment motion, the district court found that O'Donnell's letters to Rosen in April and June of 1996 "were sufficient to apprise Rosen, an experienced real estate developer, that conduct of Mintz

Levin had caused Rosen harm."  Further, the district court found that

> quite apart from Mary O'Donnell's April and
> June 1996 letters, and at least by September
> 20, 1995[,] Rosen was aware that the O'Donnell
> interests could pay the balance of the Edison
> Note at any time. . . .  The [letters] were
> merely a reminder to Rosen of what it actually
> knew on September 20, 1995: Rosen did not have
> an exclusive option to acquire a 50% interest
> in the Edison Site, because the Fill Agreement
> did not grant Rosen the exclusive right to pay
> the balance of the Edison Note.

Finally, the district court also held that even though "neither party devoted much argument to the easement question," "[t]o the extent that there was appreciable harm as a result of the easement problems, the record demonstrates that Rosen had actual knowledge of that harm prior to September 2, 1996."

Rosen now appeals the district court's grant of summary judgment for Mintz Levin.  In Rosen's view, the summary judgment record does not compel a finding that it knew or should have known that Mintz Levin's drafting of the Fill Agreement was the cause of its harm until at least the Massachusetts state court rejected its lawsuit against O'Donnell.

**II.**

We review the grant of summary judgment de novo. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Summary judgment is proper when the record shows that "the pleadings, depositions, answers to interrogatories and admissions on file

-8-

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party," and "material facts" are those that "might affect the outcome of the suit under governing law." Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In assessing the summary judgment record, the facts, as well as the reasonable inferences that may be drawn from them, must be viewed in the light most favorable to the non-moving party. See, e.g., Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).

Rosen, the non-moving party here, pressed two legal malpractice claims against Mintz Levin. First, Rosen claims that Mintz Levin negligently failed to draft the Fill Agreement to protect Rosen's right to secure a permanent interest in the Edison Site. Second, Rosen urges that Mintz Levin negligently advised Rosen regarding its desire to obtain an easement on the Edison Site from O'Donnell. The parties agree correctly that the substantive law of Massachusetts provides the rules of decision in this diversity case, Pitts v. Aerolite SPE Corp., 673 F.Supp. 1123, 1127 (D. Mass. 1987), and that Massachusetts specifies a three-year statute of limitations for legal malpractice claims. Mass. Gen. L.

-9-

ch. 260, § 4.  Under Massachusetts law, the limitations period begins to run "[o]nce a client or former client knows or reasonably should know that he or she has sustained appreciable harm as a result of the lawyer's conduct . . . ." Williams v. Ely, 423 Mass. 467, 473 (1996).  "[A] plaintiff [must] have (1) knowledge or sufficient notice that she was harmed, and (2) knowledge or sufficient notice of what the cause of the harm was." Bowen v. Eli Lilly Co., 408 Mass. 204, 208 (1990)(cited with approval in Williams, 423 Mass. at 473).

### A.    Rosen's Malpractice Allegation Regarding Its Right to Secure a Permanent Interest in the Edison Site

#### 1.    The Continuing Representation Doctrine

At least by March 1996, when Mintz Levin sent a letter to O'Donnell's counsel asserting that Rosen's option to secure a permanent interest in the Edison Site survived O'Donnell's prepayment of the Edison Note, Rosen began spending time and money disputing O'Donnell's interpretation of the Fill Agreement.  Rosen continued expending time and money to defend its claim under Section 6(b), which it now alleges was negligently drafted by Mintz Levin, throughout the summer and fall of 1996.  More letters were sent from counsel to O'Donnell, and Rosen and its attorneys prepared to sue O'Donnell in state court.

For purposes of accrual of a legal malpractice claim, "harm" occurs when a client expends "additional legal fees to ameliorate the harm caused by [his original attorney's] error."

-10-

<u>Levin</u> v. <u>Berley</u>, 728 F.2d 551, 554 (1st Cir. 1984)(interpreting Mass. G. L. c. 260, § 4). <u>See also</u> <u>Cantu</u> v. <u>St. Paul Cos.</u>, 401 Mass. 53, 57 (1987); <u>Massachusetts Elec. Co.</u> v. <u>Fletcher, Tilton & Whipple</u>, 394 Mass. 265, 268-269 (1985). On these facts, there is no question that Rosen suffered harm related to its rights under Section 6(b) prior to September 2, 1996, the cutoff date under the "tolling and standstill" agreement. Accordingly, we turn now to the causation component of the accrual analysis.

The critical inquiry here is when Rosen knew, or reasonably should have known, that Mintz Levin's alleged malpractice, and not O'Donnell's purported breach, was the cause of Rosen's harm. <u>Williams</u>, 423 Mass. at 473. Rosen claims that it should not reasonably have known at any time outside the three-year statute of limitations period that Mintz Levin caused the harm because, in part, Mintz Levin itself led Rosen to believe that it would prevail in its suit against O'Donnell. As evidence of this claim, Rosen points to a letter Mintz Levin drafted in July 1996 to send to O'Donnell's counsel, which included the following passage:

> Our client feels very strongly that he negotiated a valid agreement and that he deserves to reap the benefits of that negotiation. If need be, we are prepared to initiate and prosecute an action against O'Donnell . . . for breach of the [Fill Agreement] and other related claims. We are confident that we will obtain the following preliminary and permanent relief: . . . Rosen's right to continued ownership, up to an undivided 50% interest, in the Boston Edison Site, with all attendant rights,

-11-

> notwithstanding O'Donnell's payoff of the Edison Mortgage. . . .

Even though this letter ultimately was not sent to O'Donnell, it is probative of Mintz Levin's representations to Rosen regarding the strength of its case against O'Donnell. Mintz Levin supported Rosen's interpretation that O'Donnell had breached the Fill Agreement and Rosen's belief that O'Donnell, not Mintz Levin, was the source of its harm.

Furthermore, defendant Leonard, one of Rosen's primary lawyers at Mintz Levin, testified during his deposition that although the firm did not represent Rosen in the litigation commenced against O'Donnell in state court in November 1996, "[w]e worked both with that other counsel [Farrah] and with Mr. Rosen directly in trying to resolve [the dispute with O'Donnell]." Leonard further testified that during the fall of 1996, Mintz Levin attorneys "were [Rosen's] lawyers for the purpose of seeing whether we could memorialize a resolution of [his dispute with O'Donnell]."

These facts implicate the doctrine of continuing representation, which tolls the statute of limitations "while the defendant attorney continues to represent the plaintiff . . . ." Cantu, 401 Mass. at 58. The continuing representation doctrine "recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess

the techniques employed or the manner in which the services are rendered."  Murphy v. Smith, 411 Mass. 133, 137 (1991).  Thus explained, the continuing representation doctrine affirms the relevance of ongoing legal representation to the critical cause of action accrual question--whether Rosen should have known that Mintz Levin's alleged malpractice, and not O'Donnell's purported breach, was the cause of Rosen's harm.  Mintz Levin's assurances that Rosen would prevail in its suit against O'Donnell, and Mintz Levin's participation in the preparation for that suit, are consistent with the innocent reliance that the continuing representation doctrine protects.

The factually apposite case of Eck v. Kellem, 51 Mass. App. Ct. 850 (2001), demonstrates the importance of the continuing representation doctrine to the outcome here.[1]  In Eck, plaintiffs brought a legal malpractice suit against Kellem, the attorney who prepared the purchase and sale agreement in a real estate transaction in which the purchaser successfully sued Eck for misrepresentations regarding the property.  Eck had instructed

---

[1]Mintz Levin attempts to distinguish Eck by claiming that the facts are "significantly different from those of the case at bar" and that the Eck court "was careful to limit its holding to the specific facts of that case[.]"  We do not think that the language from Eck cited by Mintz Levin--"[w]e conclude that on this record the statute of limitations did not begin to run upon the commencement of the [third party's] suit . . ."--means that the case only has precedential value on identical facts.  Eck, 51 Mass. App. Ct. at 856 (emphasis added).  Also, as we explain, we find the facts of Eck sufficiently similar to the case at bar to be persuasive on the accrual issue.

-13-

Kellem to draft the purchase and sale agreement to protect Eck from future claims by the purchaser for liability for hazardous waste contamination on the property. However, the purchaser did sue Eck for the contamination, and Eck chose another attorney to represent him because Kellem would be a witness in the litigation. Kellem, however, reassured both Eck and his new attorney that Eck would prevail at trial. This prediction did not prove prescient--Eck lost at trial and then sued Kellem for legal malpractice. Kellem moved for summary judgment, arguing Eck's malpractice claim against him was time barred.

The Massachusetts Appeals Court noted that "[t]hese facts bring the case close to the doctrine of continuing representation." Eck, 51 Mass. App. Ct. at 855. It framed the question as "whether it was the commencement of the [purchaser's] suit, or the judgment therein, that was the first event reasonably likely to put Eck on notice that Kellem's sale agreement may have caused his injury . . . ." Id. at 853. In finding that the statute of limitations began to run from the time of judgment, the Eck court relied on Kellem's reassurances to Eck that the purchase and sale agreement would protect him and that "[w]hether, in fact, Kellem was negligent in the preparation of the sale agreement had to await the outcome of the [purchaser's] suit . . . . " Id. at 855. Accord Spilios v. Cohen, 38 Mass. App. Ct. 338, 339-40 (1995)(holding that since it was only possible to determine whether there was legal malpractice

after a verdict on the underlying dispute was rendered, the statute of limitations did not begin to run until that time).

Rosen's situation is similar to Eck's. Mintz Levin continued to assure Rosen that it would prevail in its action against O'Donnell and that the Fill Agreement protected Rosen's rights. Furthermore, Rosen engaged another attorney, as did Eck, for reasons unrelated to any dissatisfaction with Mintz Levin. Until the Massachusetts state court ruled that O'Donnell did not breach the Fill Agreement, Rosen reasonably believed that O'Donnell, not Mintz Levin, was the cause of its harm.[2]

To start the statute of limitations running, "[t]here must be notice of a <u>causal relationship</u> between the harmful event attributed to the defendant . . . and the harm suffered by the plaintiff." <u>Eck</u>, 51 Mass. App. Ct. at 853 (internal citations omitted)(emphasis added). See also <u>Int'l Mobiles Corp.</u> v. <u>Corroon & Black/Fairfield & Ellis, Inc.</u>, 29 Mass. App. Ct. 215, 218 (1990)

_____

[2]The Massachusetts Superior Court wrote that

> [t]here is no evidence in the summary judgment record to show or support the plaintiff's claims of an <u>exclusive</u> right to acquire an ownership interest in the [Edison Site], or to preclude the defendants from paying off that mortgage and securing title to that property free and clear of any permanent interest or ownership right in the plaintiffs.

<u>Rosen Constr. Ventures</u> v. <u>O'Donnell Sand and Gravel, Inc.</u>, No. 96-6583E, Order of Court, (Suffolk Superior Court, April 29, 1998)(emphasis in original).

-15-

("Notice here refers . . . to discovery of the plaintiff's injury as <u>causally connected to</u> the defendant's negligence.") (emphasis added). The judgment of the Massachusetts court provided Rosen with notice of that causal relationship between Mintz Levin's drafting of the Fill Agreement and the harm Rosen suffered when O'Donnell prepaid the Edison Note.

### 2. <u>Knowledge of Actual Harm</u>

Mintz Levin argues that Rosen is not protected by the continuing representation doctrine because Rosen actually knew that it suffered appreciable harm because of Mintz Levin's conduct. <u>Lyons</u> v. <u>Nutt</u> 436 Mass. 244, 250 (2002)(the "doctrine has no application . . . where the client actually knows that he suffers appreciable harm as a result of his attorney's conduct."). The district court held that Rosen indeed had actual knowledge that Mintz Levin caused its harm because O'Donnell's letters in April and June of 1996, setting forth its position regarding the interpretation of the Fill Agreement, "at the very least called to Rosen's attention that the exclusivity provision it had desired was missing from the Fill Agreement" and put Rosen on notice "that the conduct of Mintz Levin had caused Rosen harm."

The district court further found that Clifford Rosen's September 20, 1995, memorandum to file, stating that he understood "that as with most loan[s], she could prepay at anytime," indicates that Rosen knew that it lacked the exclusive option to acquire a

-16-

50% interest in the Edison Site because it lacked the exclusive option to reduce the Edison Note. On appeal, Mintz Levin seeks to bolster the district court's grounds for the summary judgment ruling in its favor by drawing attention to four other items in the summary judgment record that, in its view, support the finding that Rosen had actual knowledge of being harmed as well as of the cause of that harm.

For the sake of clarity in our explanation, we discuss these items in a slightly different order than Mintz Levin presented them. First, according to Mintz Levin, its draft complaint against O'Donnell did not include a cause of action for breach of Section 6(b) of the Fill Agreement. Second, Mintz Levin urges that the plain language of the Fill Agreement itself was sufficient to put Rosen on notice that it lacked an exclusive option to secure a reduction in the Edison Note. Third, Donald Anastasia, Boston Edison's attorney who negotiated with Rosen regarding the Edison Note, memorialized their May 17, 1995, conversation in handwritten notes that stated "[Rosen's] concern: O'D[onnell] pays off note soon, little left to discount." Fourth, Michael Northrup, Rosen's in-house counsel, stated in his deposition that he was concerned about ambiguities in the Fill Agreement and that Mintz Levin's drafting of the Fill Agreement was "sloppy."

We assess these four contentions in turn, keeping in mind our obligation to consider the facts, and their reasonable inferences, in the light most favorable to Rosen, the non-moving party. We will then consider the grounds explicitly relied upon by the district court.

a. The draft complaint

Mintz Levin points to its draft complaint against O'Donnell, which it discussed with Rosen, and the draft's omission of a cause of action against O'Donnell for breach of Section 6(b). Mintz Levin argues that this omission is significant because it shows that Rosen understood at that time that O'Donnell did not breach its obligations under Section 6(b). Reading the draft complaint as a whole, we find Mintz Levin's argument unpersuasive. Although Count I of the draft complaint, titled "Breach of Contract and Action for Specific Performance," does not specifically allege breach of Section 6(b), the draft complaint contains several passages regarding Section 6(b) that could reasonably lead a client to believe that his allegations of breach were addressed in the complaint.

For example, the draft complaint states that "[o]n or about April 2, 1996, notwithstanding Section 6(b) of the Rosen-ODSG Fill Agreement, and without any notice to Rosen, ODSG paid off the outstanding balance due on the ODSG-Edison Note and Mortgage two years in advance of the scheduled final payment date of March 6,

-18-

1998. . . ." Count II of the draft complaint, alleging breach of the covenant of good faith and fair dealing, alleges that

> ODSG's actions, namely paying down the entire Note and Mortgage on the Edison Site in May, 1996 rather than March, 1998, as contemplated by the parties and according to the express schedule in the Secured Promissory Note, and without the consent of or notice to Rosen, the 51% owner of the property as a tenant in common, with knowledge that Rosen was actively negotiating a reduction or discount in the outstanding principal due on the mortgage with Boston Edison, has purportedly eliminated Rosen's right to retain an ownership interest in the Edison Site under the Rosen-ODSG Fill Agreement.

> By such conduct, ODSG has breached the covenant of good faith and fair dealing.

Similarly, Count III of the draft complaint, alleging intentional interference with advantageous business relations, characterized O'Donnell's prepayment of the Edison Note as interfering with Rosen's right under Section 6(b) to obtain a permanent interest in the Edison Site. Count VI, seeking declaratory relief, asserts that "Rosen is entitled to retain an ownership interest in the Edison Site at the time reconveyance of its 51% interest is triggered pursuant to the Rosen-ODSG Fill Agreement on account of ODSG's breach of contract and breach of covenant of good faith and fair dealing in paying down the Boston Edison mortgage thereby purportedly preventing Rosen from securing a reduced or discounted mortgage." Finally, the draft complaint's Prayer for Relief urges that "Rosen is entitled to retain an

ownership interest in the Edison Site, in an amount to be determined at trial, on account of ODSG's breach of contract and breach of covenant of good faith and tortious interference with Rosen's business relationship in paying down the Boston Edison mortgage thereby preventing Rosen from securing a reduced or discounted mortgage."

On the whole, Mintz Levin's draft complaint characterizes O'Donnell's prepayment of the Edison Note as a breach of O'Donnell's duties to Rosen imposed on it by Section 6(b). The absence of this language in the specific count alleging breach of contract is not sufficient to charge Rosen with knowledge of Mintz Levin's alleged malpractice in drafting Section 6(b). This is especially true since the affidavit of one of the defendants, Stephen Leonard, is the only statement in the record alleging that Rosen discussed with Mintz Levin whether a count for breach of Section 6(b) could be included in the draft complaint.[3] Reading these facts and drawing inferences in the light most favorable to Rosen, we find that the absence in the draft complaint of a specific count of breach of contract under Section 6(b) is

---

[3]Clifford Rosen was asked during his deposition if he discussed the complaint with any of three people: Mr. Northrup, his in-house counsel; Mr. Farrah, the attorney who represented Rosen in his state court litigation against O'Donnell; and Mr. Carey, an employee of Rosen's whose role is unidentified in the materials before this court. Rosen replied that he did not recall discussing the complaint with any of these individuals. Mintz Levin has not directed our attention to any questions to Rosen about conversations he might have had with Leonard about the complaint.

insufficient to charge Rosen with actual knowledge that Mintz Levin's alleged drafting error caused its harm, particularly because the draft complaint amply referenced O'Donnell's obligations to Rosen under Section 6(b).

        b.    <u>Language in the Fill Agreement</u>

We also are unpersuaded that the language in the Fill Agreement was sufficient to apprise Rosen that it lacked the exclusive option to secure a permanent interest in the Edison Site by reducing the principal balance of the Edison Note. The relevant portion of Section 6(b) states that "if Rosen, in its sole discretion, is able to negotiate with Edison a forgiveness of, or a reduction in, the principal amount due in order to obtain a discharge of the Edison Mortgage . . . ." It is a reasonable inference that a lay person, even an experienced real estate developer, may not have realized that this language failed to protect Rosen's right to secure a permanent interest in the Edison Site.

Indeed, Mintz Levin's draft complaint against O'Donnell supports Rosen's argument that it reasonably thought that Section 6(b) of the Fill Agreement, as drafted, protected its right to secure a permanent interest in the Edison Site by negotiating a forgiveness of or a reduction in the principal amount of the Edison Note, even though the express language of Section 6(b) does not prohibit O'Donnell from prepaying the balance of the Edison Note.

-21-

In Rosen's view, its right to negotiate a reduction in the Edison Note in exchange for a permanent interest in the Edison Site implied that O'Donnell could not terminate that right at any time simply by paying off the principal balance with no warning to Rosen. Otherwise, Rosen's right to secure a permanent interest through the negotiations with Edison would have little value. Mintz Levin articulated that view of the meaning of Section 6(b) when it alleged in the draft complaint that the covenant of good faith and fair dealing precluded O'Donnell from paying off the Edison Note almost two years early.

On these facts, it is not enough to argue, as Mintz Levin does, that the express language of Section 6(b) was sufficient to apprise Rosen that it lacked the rights Rosen thought it had negotiated, and that Mintz Levin's drafting was the source of that exposure. Rosen relied on Mintz Levin's expertise to draft an agreement that would protect its ability to secure a permanent interest in the Edison Site. "The attorney . . . is an expert, and much of his work is done out of the client's view. The client is not an expert; he cannot be expected to recognize professional negligence if he sees it, and he should not be expected to watch over the professional or to retain a second professional to do so." Hendrickson v. Sears, 365 Mass. 83, 90 (1974). Until the Massachusetts state court told Rosen that the express language of Section 6(b) did not protect its right to secure a permanent

-22-

interest in the Edison Site, Rosen reasonably thought it was protected.  In consequence, we decline to hold that the plain language of Section 6(b) is enough to apprise Rosen of Mintz Levin's alleged negligence in drafting the agreement.

c. <u>Anastasia's note</u>

Donald Anastasia's note of May 17, 1995, a month after the Fill Agreement was executed, mentions "His [Rosen's] concern: O'D[onnell] pays off note soon, little left to discount."  This notation also does not carry the import that Mintz Levin seeks. The notation is set forth on a sheet of paper covered with informal handwritten commentary by Boston Edison's attorney about an array of subjects discussed during a phone conversation with Rosen, all apparently related to the status of the shopping center project. The topics include an upcoming commission meeting, barging in the required fill, a physical tie-in on the railroad crossing, and Rosen's needs for meeting "DPU criteria," which presumably refers to the Massachusetts Department of Public Utilities.  On the top right hand corner of the page, inserted at an angle, is the note: "Give him status report -- early June?  His concern: O'D[onnell] pays off note soon, little left to discount."

The language Mintz Levin cites is ambiguous.  On one view, it could simply refer to the payment schedule of O'Donnell's Edison Note.  If O'Donnell continued making payments on the note according to schedule, the balance on the note would be reduced to

a million dollars by June 1996, just over a year into the future. At that point, Rosen would be precluded from obtaining the full 50% ownership interest in the Edison site it sought because there would be less than a million dollars to discount.[4]  Although other readings of Anastasia's note are possible, we decline to hold that a third party's brief, ambiguous note recorded during a phone conversation with Rosen proves that Rosen had actual knowledge that Mintz Levin allegedly was negligent in drafting the Fill Agreement.

### d. Northrup's testimony

Mintz Levin claims that

> Rosen's in-house counsel, Michael Northrup, analyzed Section 6(b) of the Fill Agreement. He warned Clifford Rosen that the provision was inconsistent with the terms that Clifford Rosen had told Northrup had been negotiated with O'Donnell.  He told Rosen that he thought that Mintz, Levin's drafting of this part of the Fill Agreement had been 'sloppy.'

Although Mintz Levin cites primarily to Northrup's deposition testimony for these propositions, Northrup's testimony does not fully substantiate this characterization.  During his deposition, when questioned about a proposed amendment to Section 6(b) that he had drafted, Northrup replied that

---

[4]Section 6(b) provides that Rosen's permanent interest in the Edison Site, not to exceed 50%, would be calculated by dividing the amount it reduced the principal owed on the Edison Note by the purchase price of $2,000,000.  Accordingly, to obtain the full 50% permanent interest it sought, Rosen would have to reduce the principal owed by $1,000,000.  In consequence, once the outstanding principal was reduced below $1,000,000, Rosen could only obtain a less than 50% permanent interest in the site.

> my primary concern is, when I first saw
> [Section 6(b)] and prepared the second
> amendment it was the fact that Clifford had
> always told me his deal was that he had an
> ability to come in and get his half-interest
> in almost any scenario. When I read it I
> didn't think it expressly or clearly stated
> that. I don't remember if prepayment was in
> my mind. I just generally didn't think it was
> fully developed as it should be to protect
> him. I don't recall at this time all of the
> various concerns I might have had in
> particular.

When asked if he brought those concerns to Rosen's attention, Northrup replied that "I certainly engaged him in conversation about them, depending upon his patience and listening ability as to how many of them got to him, but I know -- whether I emphasized one or two, I don't remember for sure, but I would have tried to have a thorough discussion." When asked if he recalled having "a particular conversation with Mr. Rosen about Paragraph 6(b) to the fill agreement as it related to Mary O'Donnell's ability to prepay the Edison note and extinguish any right he had to obtain the interest in the Edison site," Northrup responded that he did not recall specifically that point. Northrup testified that he characterized Mintz Levin's drafting of Section 6(b) as "sloppy or that kind of language," and that he "tried to deal with it in a letter [to Mintz Levin], that is the particular issue of what if he negotiated a reduction in the note, but it didn't go into effect prior to such time as she started getting the note down below the

million dollars, and how could it be that she still would have to pay and that he could retain his interest."

Reading this testimony in the light most favorable to Rosen, Northrup testified that he had concerns about the drafting of Section 6(b), that he thought it was sloppy, and that he tried to address with Mintz Levin the specific issue of what would happen if Rosen negotiated a reduction in the Edison Note that did not go into effect until after O'Donnell had paid down the outstanding balance to less than a million dollars. This concern could have been motivated by the quick pace of the regular payment schedule between O'Donnell and Edison, which provided that the balance would fall below a million dollars in June 1996, giving Rosen little more than a year to achieve its 50% permanent interest in the Edison Site through negotiating with Edison. Most importantly, however, Northrup testified that he did not recall having a conversation with Rosen about Section 6(b) "as it related to Mary O'Donnell's ability to prepay the Edison note and extinguish any right he had to obtain the interest in the Edison site." This testimony, then, read in the light most favorable to Rosen, establishes that Northrup did not recall a discussion with Rosen about O'Donnell's potential prepayment of the Edison Note and that Northrup was unsure to what degree Rosen heard and understood any of Northrup's general concerns about Section 6(b). This testimony is not enough

to charge Rosen with actual knowledge of Mintz Levin's alleged malpractice.

        e.    <u>The grounds cited by the district court</u>

Finally, we turn to the two grounds relied upon by the district court for granting summary judgment in favor of Mintz Levin: Clifford Rosen's September 1995 memo to file, stating that he was "under the understanding that as with most loan[s], [O'Donnell] could prepay at anytime," and O'Donnell's letters to Rosen in April and June 1996 setting forth its interpretation of the Fill Agreement. The district court found that the letters were "sufficient to apprise Rosen . . . that  conduct of Mintz Levin had caused Rosen harm" and that they "at the very least called to Rosen's attention that the exclusivity provision it had desired was missing from the Fill Agreement." The district court also found that O'Donnell's letters were "merely a reminder to Rosen of what it actually knew on September 20, 1995: Rosen did not have an exclusive option to acquire a 50% interest in the Edison Site, because the Fill Agreement did not grant Rosen the exclusive right to pay the balance of or reduce the Edison Note." We disagree with the assessment of the significance of the file memo and the letters.

        i.    <u>The memorandum to file</u>

The September 1995 memorandum in question, prepared approximately five months after the execution of the Fill

Agreement, includes a short recitation of O'Donnell's past payments on the Edison Note, the due dates of the scheduled future payments, and two sentences at the end: "It is understood that O'Donnell is currently negotiating to have a new payment schedule. Also, I am under the understanding that as with most loan[s], she could prepay at anytime." On its face, this language in the memorandum is the strongest piece of evidence available to Mintz Levin. Viewed through the summary judgment prism, however, it is not substantial enough to carry the summary judgment burden.

Rosen argues that this memorandum pertained to its understanding of the terms between O'Donnell and Boston Edison as set forth in the Edison Note, not the terms of the Fill Agreement. This claim is substantiated by the context of that notation, with its detailed elaboration of the payment schedule. In other words, this memorandum to file summarizes Rosen's understanding of the key terms of the Edison Note, rather than its understanding of the absence of limitations imposed on O'Donnell by the terms of the Fill Agreement. Indeed, it is entirely plausible that a mortgagor may be permitted to prepay the principal balance on an outstanding note under the terms of the note, but be prohibited from doing so by an agreement with a third party. Furthermore, the terms of the Edison Note, the arguable focus of the memorandum, would be important to Rosen in its attempt to negotiate a reduction in that note with Boston Edison. Again, Rosen is entitled to these

-28-

reasonable inferences in its favor as the non-moving party on summary judgment. Therefore, Rosen's memorandum to file regarding the terms of the Edison Note does not suffice to show that Rosen actually knew that Mintz Levin allegedly caused Rosen's harm by drafting Section 6(b) in a way that permitted O'Donnell to extinguish Rosen's right to secure a permanent interest in the Edison Site by prepaying the Edison Note.

### ii.  The O'Donnell letters

O'Donnell's letters notifying Rosen of its interpretation of the Fill Agreement did not put Rosen on notice that Mintz Levin negligently drafted the contract. Instead, the letters served only to notify Rosen that O'Donnell's interpretation of the Fill Agreement differed from Rosen's. Rosen claims that it believed that O'Donnell breached contractual obligations under the Fill Agreement by prepaying the Edison Note. Accordingly, taking the facts and their reasonable inferences in the light most favorable to Rosen, it believed that the cause of its harm was O'Donnell breaching its contractual obligations under the Fill Agreement, not Mintz Levin's alleged negligent drafting. As confirmation of this view, Rosen sued O'Donnell for breach and sought Mintz Levin's representation in the action, turning to Farrah to try the case only when Mintz Levin refused to take the case on contingency. When Rosen lost the case, it finally knew that the cause of its

harm was Mintz Levin's alleged drafting error, not O'Donnell's purported breach.

### 3. The Importance of the State Court Decision

In reaching this conclusion about the importance of the state court decision, we are not adopting the general proposition that the claims of potential plaintiffs in legal malpractice actions do not accrue until a court ruling reveals the inadequacies of their lawyer's work. However, as the facts of this case demonstrate, if a lawsuit has been filed that implicates the work of their lawyer, the outcome of that lawsuit may be highly relevant to a critical question in the accrual analysis--whether the clients should have known that their lawyers, rather than their adversaries, were responsible for the harm caused by the legal problem at issue in the lawsuit.

When Rosen first suffered harm--that is, when its right to secure a permanent interest in the Edison Site was arguably extinguished by O'Donnell's prepayment of the Edison Note--Rosen immediately took action. Rosen consulted its lawyers at Mintz Levin who assured it that the Fill Agreement protected its rights and that O'Donnell was in breach. After Mintz Levin drafted a complaint against O'Donnell but declined to take the case on a contingency fee basis, Rosen consulted another lawyer about its claim against O'Donnell. That lawyer, Farrah, filed suit on behalf of Rosen. Far from sleeping on its rights, as Rosen reasonably

understood them, Rosen sought promptly to vindicate them. Moreover, to hold that an adverse party's alleged breach of a contract is necessarily sufficient to put a client on notice that his attorney negligently drafted the contract would create a rule requiring the client in any contract dispute to immediately begin malpractice proceedings against his attorney. We decline to adopt such an untenable rule.

Instead, viewing all of the facts and their reasonable inferences in the light most favorable to Rosen, we find that a reasonable factfinder could conclude that the earliest Rosen knew, or should have known, that Mintz Levin's alleged negligence in drafting Section 6(b) caused it harm was the date the Massachusetts trial court granted summary judgment to O'Donnell--April 29, 1999-- which is well after the operative date of September 2, 1996 set forth in the standstill agreement. Because the date of the trial court decision is within the statute of limitations, we need not decide in this case whether the state trial court decision or the state appellate affirmance of that decision put Rosen on notice that Mintz Levin, and not O'Donnell, was the source of its harm.

### B. Rosen's Malpractice Allegation Regarding The Easement

Rosen raises two complaints regarding easement issues. As the district court noted, the parties did not "devote[] much argument to the easement question," and

> Rosen does not assert in this case that it was ultimately unable to secure an easement over the Edison Site. There is also no evidence that the problems that arose in securing the easement over the Edison Site would not have occurred had Mintz Levin advised Rosen to secure the easement earlier. As to the MBTA easement, Rosen does not suggest that it could have avoided a problem with the MBTA had it known (presumably at the time the Development Site was purchased) of the MBTA's easement rights.

Rosen has not remedied these shortcomings in its briefs to this court. Like the district court, we are hampered by Rosen's brevity in developing the facts and arguments on the easement issues.

Indeed, the first easement claim is almost incomprehensible as stated in the brief. In the spring of 1996, Rosen apparently requested that O'Donnell grant an easement under the provisions of Section 3(c), which states that O'Donnell "agrees that it will, upon request by Rosen, grant to Rosen . . . a perpetual easement across the Edison Site. . . ." O'Donnell resisted the request, and Rosen incurred some expenses in attempting to secure the easement. As best we can determine, Rosen is making one of two arguments in relation to Section 3(c) of the Fill Agreement.

First, Rosen might be arguing that Mintz Levin was negligent in failing to draft Section 3(c) to convey an easement outright. If so, this claim fails because Rosen could not have given Mintz Levin the information necessary for such drafting. Mintz Levin notes that in April 1995, when the Fill Agreement was

-32-

signed, "Rosen did not want O'Donnell immediately to grant an easement because at that time, Rosen did not know precisely where he wished to locate that easement." Rosen does not dispute this contention in its reply brief, and Mintz Levin supports the claim by citing to the May 1996 letter to O'Donnell requesting the easement, which explains that "the layout of the proposed easement is not currently complete," even more than a year after the Fill Agreement was signed. Since Rosen apparently did not know where it wanted the easement even in May 1996, Mintz Levin could hardly have drafted the Fill Agreement in April 1995 to convey an undefined easement.

In the alternative, Rosen might be claiming that Mintz Levin was negligent for failing to advise it to request the easement immediately after the Fill Agreement was executed. If so, Rosen's inability to define the easement it needed as late as May 1996 again defeats any claim that Mintz Levin was negligent in not advising it to secure the easement earlier.

A similar result befalls the MBTA easement issue. Rosen claims that Mintz Levin was negligent in failing to inform it that the easement on the MBTA property was for emergency use only. However, Rosen testified at his deposition that Langer informed Rosen in a May 24, 1996 letter that the MBTA easement was designated for emergency use only. Rosen also apparently incurred expenses in the spring of 1996 while attempting to resolve this

-33-

issue.  Therefore, "the necessary coalescence of discovery and appreciable harm" had occurred prior to the statutory bar date of September 2, 1996, agreed to by the parties in their stipulation, <u>Cantu</u>, 401 Mass. at 57, and the easement claim must fail.

## **III.**

For the forgoing reasons, the judgment of the district court is **<u>AFFIRMED</u>** in part and **<u>VACATED</u>** in part.  We **<u>REMAND</u>** for proceedings consistent with this opinion.

So ordered.  Each party shall bear its own costs.