**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, as Subrogee of Vicam, L.P., Plaintiff,**

v.

**BIRCH, STEWART, KOLASCH & BIRCH, LLP., Leonard R Svensson, Bernard L. Sweeney, Defendants.**

No. CIV.A. 01–10327–RBC.

United States District Court, D. Massachusetts.

July 28, 2005.

David A. Barry, William L. Boesch, Sugarman, Rogers, Barshak & Cohen, Boston, MA, Warren E. Zirkle McGuire Woods LLP, McLean, VA, for Birch, Stewart, Kolasch & Birch, LLP., Bernard L. Sweeney, Leonard R. Svensson, Counter Claimants.

Thomas J. Conlin Robins, Kaplan, Miller & Ciresi LLP., Minneapolis, MN, Bruce A. Finzen, Robins, Kaplan, Miller & Ciresi LLP., Minneapolis, MN, Lisa A. Furnald, Robins, Kaplan, Miller & Ciresi L.L.P., Boston, MA, for St. Paul Fire and Marine Insurance Company, Counter Defendant.

Guive Mirfendereski, Newton, for Vicam Limited Partnership, Interested Party.

## MEMORANDUM AND ORDER ON DEFENDANTS' LEONARD R. SVENSSON AND BERNARD R. SWEENEY'S MOTIONS FOR SUMMARY JUDGMENT (## 71 & 73)

COLLINGS, United States Magistrate Judge.

### I. INTRODUCTION

In this action, St. Paul Fire and Marine Insurance Company ("St.Paul"), as subrogee of Vicam, L.P. ("Vicam"), has alleged legal malpractice claims against the law firm of Birch, Stewart, Kolasch & Birch, LLP. ("BSKB") and two of its attorneys, Leonard R. Svensson ("Svensson") and Bernard R. Sweeney ("Sweeney"). This matter is before the Court on Svensson's and Sweeney's Motions for Summary Judgment, # 71 and # 73 respectively. St. Paul has submitted its Opposition to Defendant Svensson's Motion for Summary Judgment, # 85, and its Opposition to Defendant Sweeney's Motion for Summary Judgment, # 86. Both Svensson and Sweeney have submitted Reply Memoranda in support of their motions for summary judgment, # 83 and # 82 respectively. The motions are now in a posture for resolution. For the reasons set forth below, the Court denies both motions for summary judgment.

### II. FACTUAL BACKGROUND [1]

Beginning in February, 1995, Vicam learned that its competitor, Neogen Corporation ("Neogen"), had begun developing a product to compete with Vicam's AflaTest, for which Vicam held two patents. # 87, Exh. 2 at 1:76. In July, 1996, Neogen sent a letter to Vicam informing Vicam that it had started to field test its product, and assuring Vicam that its product had been "thoroughly reviewed by patent counsel and found not to infringe" Vicam's patents.

1. The facts underlying this litigation have been set forth in the Court's previous opinion, *St. Paul Fire and Marine Insurance Co. v. Birch, Stewart, Kolasch & Birch, LLP.*, 233 F.Supp.2d 171 (D.Mass.2002). For that reason, the Court states only the facts necessary to resolve this motion.

St. Paul has objected to the form of Defendants' Joint Statement of Facts (# 75) as containing immaterial and/or disputed facts as required by Local Rule 56.1. St. Paul's Local Rule 56.1 Statement of Material Facts, # 88 at 1. The Court agrees that the Defendants have failed to comply with Local Rule 56.1. Local Rule 56.1 requires summary judgment movants to include with their motions: "a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation." The Defendants' statement of facts is neither concise (it contains immaterial and disputed facts) nor accurate-the facts presented are often not supported by the documents to which the Defendants point. The Defendants' failure to comply with the rule has burdened both the Plaintiff and the Court. For that reason, the Court has relied on St. Paul's Statement of Material Facts, # 88, or on their foundational materials, Aff. of Lisa Furnold in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, # 87, in setting out the facts here.

Complaint, # 1, ¶ 13; Answer, # 2, ¶ 13; # 87, Exh.2 at 1:81–82. In early August, 1996, Vicam employees obtained a brochure for Neogen's product at a trade conference. The brochure distressed Jack Radlo, Vicam's President and Chief Executive Officer ("Radlo"), because Neogen's product looked like a "direct knock-off" of the AflaTest. # 87, Exh. 2 at 1:97. Vicam began to discuss with Svensson, its patent attorney, the possibility that Neogen was promoting a product that potentially infringed its patent. # 87, Exh.1 at 1:100. Radlo and Svensson discussed a number of options for dealing with the threat posed by Neogen's new product. # 87, Exh. 1 at 100–102; 120–21; 125. Ultimately, Svensson proposed that Vicam send a letter to Vicam's customers advising them of the situation with Neogen. # 32 Exh. D; # 87, Exh.1 at 2:237–38. Svensson drafted a letter, most or all of which Radlo and Vicam adopted in their letter, and advised Radlo and Vicam that they could appropriately send the letter to customers. # 2, ¶ 20. The letter, dated August 12, 1996, notifies customers that its competitor, Neogen, had developed a test kit that Vicam considered to infringe Vicam's patents relating to the detection of aflotoxins, and that Vicam was prepared to take legal action against infringers of its patent. # 87, Exh. 5. Relying on Svensson's advice, Radlo faxed the letter ("Dear Valued Customer Letter") that Svensson had drafted to Vicam's customers.

Though the parties dispute the specifics of discussions surrounding the decision to send the Dear Valued Customer Letter, Svensson admits that he did not discuss what might happen if Vicam sent the letter and a court found no infringement. # 87, Exh. 1, at 124–25; 132; 155–56. Further, Svensson did not discuss with Radlo the types of claims that Neogen might raise in a lawsuit, id. at 178, although he told Radlo that he thought there was a "low chance" of Neogen filing suit and that "that would be a pretty aggressive move on Neogen's part." Id. at 194. Svensson believed, in any event, that Vicam had a good faith basis for alleging infringement in the August 12 letter. # 87, Exh. 1 at 207. Thus, Svensson apparently did not advise Vicam that sending the letter might expose Vicam to liability for defamation and other torts if Neogen could establish that Vicam was acting in bad faith in sending the letter. # 88 at 2 ¶ 2. Although Svensson raised a concern with Radlo about the importance of determining whether Neogen's product used monoclonal or polyclonal antibodies, # 87, Exh.2 at 1:130, a distinction that ultimately bore on the infringement issue, id., Radlo testified in his deposition that Svensson did not advise Radlo to wait to send the letter until Vicam could establish whether Neogen's product in fact infringed Vicam's patents. Id. at 129–131; Exh. 1 at 132.

On or about August 16, 1996, Neogen sued Vicam and Radlo in the United States District Court for the Western District of Michigan for trade libel, tortious interference with potential advantageous relationships, and tortious interference with contractual relationships. # 1 ¶ 21. Sweeney represented Vicam and Radlo in that action. # 1, ¶ 22; # 2, ¶ 22. Although that suit was dismissed for lack of personal jurisdiction, # 1 ¶¶ 22, 23, Neogen refiled its complaint against Vicam and Radlo in the United States District Court for the Middle District of Florida (the "Florida Lawsuit"), # 1 ¶ 24, this time alleging corporate defamation and other business torts, and seeking a declaratory judgment on the question of infringement. # 1 ¶ 24. St. Paul, Vicam's insurer, agreed to pay one-half of the attorney's fees and costs incurred by Vicam in the Florida Lawsuit. # 1 ¶ 27. St. Paul also agreed to defend Vicam and Radlo in the Florida Lawsuit,

under a reservation of rights, and referred the matter to its Florida staff counsel, J. Scott Murphy ("Murphy"). Murphy had several years experience as a litigator, but no background or expertise in intellectual property. # 32 ¶ 12. At Vicam's and Murphy's request, BSKB and Sweeney represented Vicam and Radlo in the Florida Lawsuit. During the course of the litigation, Svensson and Sweeney assured Vicam that Neogen's claims were baseless and that Vicam had a high likelihood of prevailing. # 88, ¶ 8; # 87, Exh. 10 at 231–3.

During a hearing before the Florida trial judge, Sweeney made the strategic decision that Vicam would not assert the advice-of-counsel defense and would not waive the attorney-client privilege. # 88 at 7 ¶ 9. In January 2000, the Florida trial court entered judgment in favor of Neogen on the question of infringement and found that Neogen's new product did not infringe the Vicam patents. *Id.* at 8 ¶ 17. The Florida court, ruling from the bench, also denied Vicam's motion for summary judgment on the tort claims and found that the issue of whether Vicam had sent the "Dear Valued Customer Letter" in "bad faith" was an issue for the jury. # 88 at 8 ¶ 16. At the pretrial conference on March 15, 2000, Sweeney reaffirmed his decision not to assert the advice-of-counsel defense. # 88 at 9 ¶ 19. Trial began on the remaining tort claims sometime later in March 2000. After two days of trial, Vicam and Radlo agreed to settle the remaining claims with Neogen for two million dollars, which St. Paul paid under the terms of the insurance policy. St. Paul, pursuant to the general liability policy and agreement with Vicam, paid one-half of BSKB's fees, amounting to $1.8 million.

Sometime later, Vicam settled its own claims against BSKB for legal malpractice, Plaintiff's Undisputed Material Facts, # 40 ¶ 26, in an agreement that acknowledged St. Paul's right to proceed against BSKB in a separate action. Settlement and Mutual Release # 41, filed under seal. In a separate document, "Disclosure Authorization and Confidentiality Agreement," Vicam agreed to waive its attorney-client privilege. Reply Mem. in Support of Def.'s Mot. to Dismiss, # 43, Exh. A. On February 22, 2001, St. Paul brought this action as Vicam's "subrogee" asserting claims of legal malpractice against BSKB.

### III. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when the record shows that "the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000) (citation omitted.). "[A]n issue is 'genuine' if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party." *Fajardo Shopping Center, S.E. v. Sun Alliance Ins. Co. of Puerto Rico, Inc.,* 167 F.3d 1, 7 (1st Cir. 1999); *see also Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.), *cert. denied,* 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995).

The party moving for summary judgment "bears the initial burden, which may be discharged by pointing to the absence of adequate evidence supporting the nonmoving party's case." *Michelson v. Digital Financial Services,* 167 F.3d 715, 720 (1st Cir.1999) (citations omitted). Once the moving party has met its burden, "the

onus is on the nonmoving party to present facts that show a genuine issue for trial." *Id.* (citations omitted). In determining whether summary judgement is proper, the Court "view[s] all the facts in the light most favorable to the nonmoving party and indulge[s] all inferences advantageous to that party, provided they arise reasonably from the record." *Villanueva v. Wellesley College,* 930 F.2d 124, 127 (1st Cir.), *cert. denied,* 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991) (citation omitted). The party opposing summary judgment, however, "may not rest on mere allegations or denials of his pleadings." *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 37 (1st Cir.1995) (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,* 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). Rather, to resist summary judgment, the nonmoving party must produce "definite, competent evidence" on which the nonmovant bears the ultimate burden of proof. *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992) (citations omitted). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (stating that summary judgment must enter "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

## B. Svensson's Motion for Summary Judgment

Svensson makes three arguments in support of his motion for summary judgment. First, he argues that St. Paul lacks standing as Vicam's subrogee to bring a claim for legal malpractice.[2] Second, he argues that the legal malpractice action is barred by the statute of limitations. Finally, Svensson argues that he owed no duty to warn Vicam of the possibility that Neogen would file suit because Neogen's claims were meritless. For the reasons set out below, the Court denies Svensson's motion in its entirety.

### 1. Subrogation and Legal Malpractice Claim

 St. Paul has asserted claims against Vicam's attorneys as Vicam's subrogee under the terms of its insurance policy and under principles of statutory and/or common law. # 1 ¶ 38. The Defendants have moved for summary judgment arguing that St. Paul, as subrogee, does not have standing under Massachusetts law to bring its cause of action for legal malpractice. Although the Supreme Judicial Court of Massachusetts has permitted the voluntary assignment of legal malpractice claims, *New Hampshire Ins. Co., Inc. v. McCann,* 429 Mass. 202, 210, 707 N.E.2d 332, 336 (Mass.1999) (refusing to recognize

---

**2.** The Defendants previously raised this issue in their Memorandum in Support of Defendants' Motion to Dismiss. # 31. The Court addressed this argument in the context of its choice-of-law analysis in *St. Paul Fire and Marine Ins. Co.,* 233 F.Supp.2d at 181–83, and deferred a determination of this question. The parties have adequately briefed this question, and as the question is a purely legal one, no further briefing on the point is necessary. Sweeney joins in this portion of Svensson's Motion for Summary Judgment. Memorandum in Support of Defendant Sweeney's Mo-

tion for Summary Judgment, # 74 at 6 n.7. For purposes of clarity, the Court refers to "Defendants" during its discussion of this issue.

The Defendants attempt to re-open the choice-of-law question in their motions for summary judgment. # 72 at 7–8. The Defendants might have raised their disagreement with the Court's ruling pursuant to Fed. R.Civ.P. 60(b). The rule imposes time constraints, however, and the Defendants' effort to reargue the question nearly two years since the Court's original decision is unreasonable.

absolute ban on voluntary assignment of legal malpractice claims), the parties agree that the Supreme Judicial Court has not specifically addressed the question of whether an insurer, as subrogee of its insured, may assert legal malpractice claims against the insured's defense counsel. The Court is thus presented with a matter of first impression in Massachusetts. In such a case, a federal court takes "a predictive approach," *F.D.I.C. v. Ogden Corp.*, 202 F.3d 454, 460 (1st Cir.2000), "seek[ing] guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law." *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1151 (1st Cir.1996) (citations omitted). "As long as these signposts are legible, [the federal court's] task is to ascertain the rule the state court would most likely follow under the circumstances, even if [the federal court's] independent judgment on the question might differ." *Id.* (*citing Moores v. Greenberg*, 834 F.2d 1105, 1107 n. 3 (1st Cir.1987)). Having examined the relevant Massachusetts law, the public policy considerations enunciated in *New Hampshire Ins. Co., Inc.*, the doctrine of subrogation in Massachusetts, and the rulings of other jurisdictions, the Court determines that, under the facts presented in this case, St. Paul has standing to pursue its legal mal-

practice action against the Defendants under its right of subrogation.

### a. *Relevant Massachusetts Law: New Hampshire Ins. Co., Inc. v. McCann*

Massachusetts is among a minority of jurisdictions that have permitted the assignment of legal malpractice claims. *New Hampshire Ins. Co., Inc. v. McCann*, 429 Mass. 202, 707 N.E.2d 332 (Mass.1999). The Massachusetts Supreme Judicial Court has expressly rejected the reasoning of the majority of courts that have prohibited the assignment of legal malpractice claims on public policy grounds [3] and has concluded that not "every voluntary assignment of a legal malpractice claim should be barred as a matter of law." *New Hampshire Ins. Co., Inc.*, 429 Mass. at 209, 707 N.E.2d at 336. Noting that "most claims in Massachusetts are assignable," *id.*, the Supreme Judicial Court has stated generally that claims should be assignable "unless some clear rule of law or professional responsibility, or some matter of public policy necessitates that the assignment should not be enforced." *Id.* at 209–20, 707 N.E.2d at 336. The Supreme Judicial Court upheld the assignment under the facts before it, recognizing and approving a number of policy considerations. First, it noted that "voluntary as-

---

**3.** The majority of courts that prohibit the assignment of legal malpractice claims follow the reasoning set forth in the seminal case, *Goodley v. Wank & Wank, Inc.*, 62 Cal.App.3d 389, 133 Cal.Rptr. 83 (1976). Their reasoning is bottomed on the concern that the assignment of legal malpractice claims could, among other things, 1) "relegate the legal malpractice action to the market place" and permit "economic bidders who have never had a professional relationship with the attorney" to sue for malpractice; 2) "embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attor-

ney and client." *Goodley*, 62 Cal.App.3d at 397, 133 Cal.Rptr. at 87 (1976). The cases following this view, and the policy arguments to the contrary have been set forth in this Court's previous entry, *St. Paul Fire and Marine Ins. Co.*, 233 F.Supp.2d at 181–83 & n. 7, and elaborated many times elsewhere. *See, e.g., Gurski v. Rosenblum*, 48 Conn.Supp. 226, 838 A.2d 1090 (2003); Michael Sean Quinn, *On the Assignment of Legal Malpractice Claims*, 37 S. Tex. L.Rev. 1203 (1996); Kevin Pennel, Note, *On the Assignment of Legal Malpractice Claims: A Contractual Solution to a Contractual Problem*, 82 Tex. L.Rev. 481 (2003).

signment of a legal malpractice claim to a party with an interest in the claim who has 'the time, energy and resources to bring the suit' may be the most efficient way, in some instances, to realize the value of such a claim." *Id.* at 208, 707 N.E.2d at 335–36 (*quoting Thurston v. Continental Casualty. Co.*, 567 A.2d 922, 923 (Me.1989)). Second, it approved the view that a court ought " 'not allow the concept of the attorney-client relationship to be used as a shield by an attorney to protect him or her from the consequences of legal malpractice. Where the attorney has caused harm to his or her client, there is no relationship that remains to be protected.' " *Id.* at 208, 707 N.E.2d 332, 707 N.E.2d at 336 (*quoting Hedlund Mfg. Co., Inc. v. Weiser, Stapler & Spivak*, 517 Pa. 522, 526, 539 A.2d 357 (Pa.1988)). Finally, in rejecting the contention that assignment would "demean the public confidence in the legal profession," *New Hampshire Ins. Co., Inc.*, 429 Mass. at 211, 707 N.E.2d at 337, the Supreme Judicial Court noted that "providing shelter for attorneys by prohibiting the voluntary assignment of malpractice claims [ ] would actually diminish public confidence in the profession by creating the perception that the system provides attorneys with unjustified special protection." *Id.* (citations omitted)

However, the Supreme Judicial Court also noted that the "involuntary" assignment of malpractice claims "typically by way of bankruptcy or foreclosure," *id.* at 208 n. 4, 707 N.E.2d at 335 n. 4, may "be more likely to implicate policy concerns."

*Id.* This language, the Defendants argue, compels the conclusion that the Supreme Judicial Court would likely prohibit the subrogation of a legal malpractice claim.[4] # 43 at 1. St. Paul, in turn, argues that subrogation in this case would implicate none of the policy concerns raised in *New Hampshire Ins. Co., Inc.* and that, indeed, the facts of this case present the "functional equivalent" of a voluntary assignment. Plaintiff's Opposition to Defendant's Motion for Summary Judgment, # 85 at 5.

Although the Supreme Judicial Court did not spell out the concerns implicated in an "involuntary transfer," those concerns have been elaborated elsewhere. *See, e.g.,* Quinn, *supra,* n. 3 at 1229–30 (cited in *New Hampshire Ins. Co., Inc.,* 429 Mass. at 211, 707 N.E.2d at 337); Tom W. Bell, Comment, *Limits on the Privity and Assignment of Legal Malpractice Claims,* 59 U. Chi. L.Rev., 1533, 1544 (1992) (same). Subrogation rights, the argument goes, are not created voluntarily, but arise "by operation of law." *Continental Casualty Co.v. Pullman, Comley, Bradley & Reeves,* 709 F.Supp. 44, 50 n. 7 (D.Conn.1989) (noting that "[w]hile subrogation is a creature of equity that exists by operation of law, assignment is a volitional transaction between the parties.") (citation and internal quotations omitted). In a legal malpractice action, an attorney is permitted under rules of professional responsibility to reveal confidential client information in order to wage a defense. *See Picadilly, Inc. v. Raikos,* 582 N.E.2d 338, 343 (Ind.1991). In the case of assignment, "[s]o long as the

---

4. In noting that involuntary transfers may be more likely to implicate public policy concerns, the Supreme Judicial Court cited two cases involving subrogation of a legal malpractice claim. *See New Hampshire Ins. Co.,* 429 Mass. at 208 n. 4, 707 N.E.2d at 335 n. 4 (*citing Continental Casualty Co. v. Pullman, Comley, Bradley & Reeves,* 709 F.Supp. 44, 50–51 (D.Conn.1989) (applying Connecticut

law and holding that excess insurer lacked standing as subrogee of insured to maintain legal malpractice action), *aff'd,* 929 F.2d 103 (2d Cir.1991); *Bank IV Wichita, Nat. Ass'n. v. Arn, Mullins, Unruh, Kuhn & Wilson,* 250 Kan. 490, 827 P.2d 758 (Kan.1992) (prohibiting assignment through foreclosure and subrogation of legal malpractice claim.)

client retains control over the suit, the scope of the disclosure can be limited by the client's power to drop the claim." *Id.* See *also* Quinn, *supra,* n. 3, at 1229–30; Bell, *supra,* at 1544. Arguably, equitable subrogation poses a greater threat to the duty of confidentiality because it arises out of equitable principles and not specific contractual language to which the insured has already agreed. An insured may thus be caught blind-sided by the operation of an equitable doctrine that permits its attorney to breach confidences. *Cf. Frost v. Porter Leasing Corp.,* 386 Mass. 425, 432, 436 N.E.2d 387, 391 (Mass.1982) (Wilkins, J., concurring) (noting that "as a realistic matter, a lay person cannot be expected to have knowledge of a common law right of subrogation.") *But see* Bell, *supra,* at 1559 (arguing in favor of subrogation rights because "clients who enter into bankruptcy or sign insurance contracts agree to sacrifice their legal rights in exchange for something they desire more (protection from creditors or from risk.)")

Even so, the Court notes that this concern for the duty of confidentiality is also present in the assignment context: "Once the client assigns the claim ... the client's control over the litigation is lost, but the attorney's right to defend himself or herself by revealing client information survives," *Picadilly, Inc.,* 582 N.E.2d at 343, and clients may be more or less aware of the consequences of assignment in any given case. In *New Hampshire Ins. Co., Inc.,* for example, the Supreme Judicial Court was untroubled by the possibility of harm to the insurer-assignor, for two reasons: it had voluntarily waived its attorney-client privilege and it was a sophisticated business entity that could fully appreciate the cost and benefit of waiving its privilege. *New Hampshire Ins. Co., Inc.,* 429 Mass. at 210, 707 N.E.2d at 337. Thus, the insurer-assignor "adequately comprehended the extent to which its confidences might be disclosed" in assigning its malpractice claim and "knowingly gave up control over confidential information by making the assignment." *Id.* On the other hand, *Otis v. Arbella Mut. Ins. Co.,* 2003 WL 21385792 (Mass.Super.2003), *aff'd,* 443 Mass. 634, 824 N.E.2d 23 (2005) applying *New Hampshire Insurance Co., Inc.,* reached a different result. In *Otis,* a "voluntary" assignment, in which the assignor had "executed agreements ... to assign the legal claims and acknowledged that the waiver implicated his attorney-client privilege," *id.,* at *4, was invalid because, among other things, the assignor's "legal acumen [was] marginal at best" and the "evidence suggest[ed] that [the assignor's] understanding of the assignment and waiver was limited ...." *Id.* Thus, even in the case of a "voluntary assignment," some inquiry into the "voluntariness" of the transfer has been appropriate.

#### b. *The Law of Subrogation in Massachusetts*

With these considerations in mind, the Court notes that St. Paul has brought this action as "subrogee" under the terms of the insurance policy and "under statutory and/or common law." #1 ¶ 38. "An insurer's right of subrogation may be reserved in an agreement between the insurer and the insured ... or may arise by implication, as a matter of general law." *Frost,* 386 Mass. at 427, 436 N.E.2d at 389 (citations omitted.) Under Massachusetts law, the doctrine of subrogation provides that "[w]hen an insurer pays an insured's claim under its insurance contract, the insurer succeeds to any right of action the insured may have against the parties allegedly responsible for the loss." *Liberty Mut. Ins. Co. v. Nat'l Consol. Warehouses, Inc.,* 34 Mass.App.Ct. 293, 296, 609 N.E.2d 1243, 1246 (Mass.App.Ct. 1993) (citations omitted). Even in the ab-

sence of an agreement permitting subrogation, an insurer who has paid an insured's claims has, with some limitations,[5] an implied or equitable right to indemnification against losses it has sustained in paying an insured's claims. *See Travelers Ins. Co. v. Graye*, 358 Mass. 238, 240, 263 N.E.2d 442, 443 (Mass.1970) (noting right to subrogation "is not dependent upon contract but 'rest[s] upon natural justice and equity' ".) (citations omitted). Even so, the presence in this case of an apparent subrogation clause [6] and other agreements between the parties inform the Court's analysis on the question of whether it would be proper to allow subrogation here.

### c. *Analysis of Subrogation of Legal Malpractice Claims*

In this case, the Court concludes that the possibility of harm to Vicam is more theoretical than real. The facts establish that Vicam was also dissatisfied with the Defendants' services and settled its own claims with the Defendants. Its relationship with the Defendants had ended. Vicam's insurance policy not only contained what appears to be a subrogation clause, but Vicam, in a separate agreement signed after the loss, acknowledged that St. Paul would pursue its own malpractice claims against the Defendants. Furthermore, Vicam has carefully protected its interests in a lengthy Disclosure Authorization and Confidentiality Agreement. # 43, Exh. A. The evidence suggests to the Court that, far from failing to appreciate the consequences of waiving its privilege, Vicam has carefully protected itself in making that waiver. In the absence of any demonstrable harm to Vicam, the Court, at least in principle, sees no reason to deny St. Paul standing as Vicam's subrogee. *Cf. Hill v. Wiley*, 295 Mass. 396, 403, 3 N.E.2d 1015, 1020 (Mass.1936) (stating that the doctrine of equitable subrogation will not be applied

**5.** Subrogation rights are not without limit in Massachusetts. "[R]ights of subrogation do not arise automatically upon payment of benefits under any contract of insurance. The availability of subrogation has generally depended on the type of coverage involved. Courts have readily implied rights of subrogation under policies covering property damage" that involve a "duty to indemnify the insured for actual loss ...," but "have not recognized implied rights of subrogation in the area of 'personal insurance' " in the absence of an express agreement. *Frost*, 386 Mass. at 428–29, 436 N.E.2d at 389–90 (citations omitted).

**6.** Although St. Paul has pled both contractual and equitable subrogation theories, it has not pointed to a specific policy provision that authorizes subrogation, nor do the parties urge the Court to construe a specific policy provision. The Defendants, however, have pointed to the following policy provision:

**Recovering Damages From a Third Party**
Any person protected under this policy may be able to recover all or part of a loss from someone other than us. Because of this, each protected person must do all that's possible after a loss to preserve any right of recovery available. If we make a payment under this policy that right of recovery will belong to us.

Defendants' Statement of Undisputed Material Facts, # 32 Exh. N at 2. Although the Defendants note that the clause does not use the term "subrogation," the Court concludes that the clause operates as a subrogation clause, especially where the policy also states that it is written in "plain, easy-to-understand English." *Id.* at 1. Though St. Paul has not pressed a contractual or conventional theory in its briefs, it seems likely that subrogation would also be proper in this case on that basis. The Supreme Judicial Court has recognized that "rights of, or akin to, subrogation not available under general law may be reserved by agreement (and ... agreement may limit subrogation otherwise available under general law.)" *Morin v. Mass. Blue Cross, Inc.*, 365 Mass. 379, 382, 311 N.E.2d 914, 916 (Mass.1974). *Cf. Frost*, 386 Mass. at 431, 436 N.E.2d at 390 (refusing to imply equitable right of subrogation into the area of personal injuries in the absence of a subrogation agreement between insurer and insured.)

"if the result is injury or prejudice to the person whose rights are sought to be used by another.")

On the contrary, the Court determines that the policy considerations discussed in *New Hampshire Ins. Co., Inc.* and indeed the policies underlying the doctrine of subrogation, would be better served by enforcing St. Paul's subrogation rights in this case.[7] First, St. Paul, under a contractual duty to defend and indemnify Vicam, bore the financial brunt of the settlement with Neogen. A rule prohibiting subrogation in this case would deny St. Paul the right to attempt to recover the loss from the Defendants, the alleged wrongdoers, even though Massachusetts courts have readily permitted such "an equitable adjustment of rights." *Frost,* 386 Mass. at 426, 436 N.E.2d at 388. *See also Nat'l Union Ins. Co. v. Dowd & Dowd P.C.,* 2 F.Supp.2d 1013, 1021 (N.D.Ill.1998) (purpose of equitable subrogation is to shift the economic burden to those responsible for the loss.) Furthermore, Vicam has little incentive to sue for legal malpractice to the extent of St. Paul's loss, having already settled its own claim for malpractice, and having already been indemnified for its loss to Neogen. Thus, as noted in *New Hampshire Ins. Co., Inc.,* permitting subrogation "to a party with an interest in the claim who has 'the time, energy and resources to bring the suit' may be the most efficient way, in some instances, to realize the value of such a claim." *New Hampshire Ins. Co., Inc.,* 429 Mass. at 208, 707 N.E.2d at 334–35 (*quoting Thurston,* 567 A.2d at 923). Denying subrogation in this case would serve to immunize the Defendants, the alleged wrongdoers, from any liability altogether. Such a result would not advance the strong public policy, articulated in *New Hampshire Ins. Co., Inc.,* to hold attorneys accountable. *Id.* at 208, 707 N.E.2d at 336. *See also Nat'l Union Ins. Co.,* 2 F.Supp.2d at 1024 (predicting that Illinois Supreme Court would recognize inequity of placing burden of legal malpractice on excess insurer, allowing negligent attorney to escape liability, because the insured lacked the incentive to sue); *Atlanta Int'l Ins. Co. v. Bell,* 438 Mich. 512, 475 N.W.2d 294, 298 (1991) (permitting primary insurer to sue insured's defense counsel and stating that "defense counsel's immunity from suit by the insurer would place the loss for the attorney's misconduct on the insurer.") Furthermore, St. Paul is not a stranger to this action, and has "an intimate connection with the underlying lawsuit," *Thurston,* 567 A.2d at 923 (cited in *New Hampshire Ins. Co.,* 429 Mass. at 208–10, 707 N.E.2d at 335–36), by dint of its contractual obligations to indemnify and defend. Indeed, because the relationship between the insurer and insured that gives rise to subrogation "preexists the malpractice and the malpractice claim," *Jones Motor Co., Inc. v. Holtkamp, Liese, Beckemeier & Childress P.C.,* 197 F.3d 1190, 1192 (7th Cir.1999), and subrogation rights are limited to insurers who, under a legal duty, have paid an insured's loss, subrogation presents fewer concerns that malpractice claims will end up in the hands of a remote party or a former adversary. *See Nat'l Union Ins. Co.,* 2 F.Supp.2d at 1024; *Continental Casualty Co.,* 709

---

**7.** The Supreme Judicial Court, in refusing to create an absolute rule prohibiting assignments of legal malpractice claims, urged a case-by-case analysis. *New Hampshire Ins. Co., Inc.,* 429 Mass. at 209, 707 N.E.2d at 336. *See also Otis,* 2003 WL 21385792, at *2 (noting that Supreme Judicial Court opted to examine claims on case-by-case basis.) Such an approach is also appropriate in the context of subrogation of legal malpractice claims. *See Atlanta Int'l Ins. Co. v. Bell,* 438 Mich. 512, 475 N.W.2d 294, 295 n. 1 (1991) ("stress[ing] that the application of equitable subrogation should and must proceed on the case-by-case analysis characteristic of equity jurisprudence.")

F.Supp. at 50 n. 7 (noting that "because equitable subrogation flows from extension of a court's equitable arm, the fear of commercial exploitation may not be as palpable in the equitable subrogation context.") Indeed, the facts of this case create few of the policy concerns of the type mentioned in *New Hampshire Ins. Co., Inc.* For example, St. Paul and Vicam's interests were aligned during the underlying litigation and thus there is no concern here about "creating a distasteful role reversal which would demean and reduce the public's confidence in the legal process." *New Hampshire Ins. Co.,* 429 Mass. at 211, 707 N.E.2d at 337. *See also Atlanta Int'l Ins. Co.,* 475 N.W.2d at 298 (noting that "[i]n a malpractice action against a defense counsel ... the interests of the insurer and the insured generally merge.")

### d. *The Law of Other Jurisdictions*

Finally, the Court concludes that the Supreme Judicial Court's reasoning in *New Hampshire Ins. Co., Inc.* accords more closely with those jurisdictions that have permitted subrogation of legal malpractice claims. *See, e.g., Ohio Casualty Ins. Co. v. Southland Corp.,* 1999 WL 236733 (E.D.Pa.1999) (applying Pennsylvania law and concluding that because Pennsylvania courts permit the assignment of legal malpractice claims, they would also permit the subrogation of those claims). Although jurisdictions are divided on the question of whether an insurer-subrogee may pursue a legal malpractice claim, the Court finds significant that a number of jurisdictions that have prohibited the assignment of legal malpractice claims have permitted the subrogation of such claims. *See, e.g., Nat'l Union Ins. Co.,* 2 F.Supp.2d at 1023 (applying Illinois law and concluding that Illinois Supreme Court would permit excess insurer, as subrogee of insured, to bring legal malpractice action although Illinois courts prohibit assignment of such

claims); *American Centennial Ins. Co. v. Canal Ins. Co.,* 843 S.W.2d 480, 483–84 (Tex.1992) (applying theory of equitable subrogation to permit excess carrier to pursue legal malpractice claim as subrogee of insured and noting that Texas courts have not permitted assignment of legal malpractice claim); *Atlanta Int'l Ins. Co.,* 475 N.W.2d at 299 (permitting subrogation although other Michigan case law prohibits assignment of claims). Several of these courts have noted that the policy concerns implicated in assignment of legal malpractice claims are minimized in the context of subrogation, or outweighed by a policy that places the social costs of legal malpractice on the malpracticing attorney. *See, e.g., Nat'l Union Ins. Co.,* 2 F.Supp.2d at 1023–24 (noting, *inter alia,* that subrogation presents fewer concerns for commercial exploitation and affirming placing social costs of malpractice on attorneys); *American Centennial Ins. Co.,* 843 S.W.2d at 483–84 (noting inequity of burdening insurer with loss caused by alleged wrongdoer); *Atlanta Int'l Ins. Co.,* 475 N.W.2d at 298 (noting, *inter alia,* that few conflicts of interest arise in subrogation context where interests of insured and insurer are often aligned).

On the other hand, the jurisdictions that have refused to recognize an insurer's right to subrogation in legal malpractice claims have, unlike Massachusetts, also flatly prohibited the assignment of legal malpractice claims. In the main, these courts invoke the policy reasons discussed and rejected in *New Hampshire Ins. Co.* in the context of assignment of legal malpractice claims. *See, e.g., Essex Ins. Co. v. Tyler,* 309 F.Supp.2d 1270, 1274 (D.Colo. 2004) (predicting that Colorado Supreme Court would prohibit subrogation of legal malpractice claims because, *inter alia,* it had also prohibited assignment of such claims); *Continental Casualty Co.,* 709 F.Supp. at 50 n. 7 (applying Connecticut

law and noting that "[t]he public policy considerations that weigh against assignment of legal malpractice claims would seem to apply with equal force to the equitable subrogation of those claims"); *Nat'l Union Fire Ins. Co. v. Salter*, 717 So.2d 141, 142 (Fla.Dist.Ct.App.1998) (policy reasons for prohibiting assignment of legal malpractice claims apply to prohibition of subrogation of legal malpractice claims), *rev. denied*, 727 So.2d 908 (Fla. 1999). Thus, a review of the law of other jurisdictions further reinforces the Court's view that the Supreme Judicial Court would extend its reasoning in *New Hampshire Ins. Co., Inc.*, and follow the reasoning of the jurisdictions that have permitted subrogation of legal malpractice claims.

### e. *Conclusion*

For all the reasons set out above, the Court is persuaded that the Massachusetts Supreme Judicial Court would recognize this cause of action under the principles of subrogation because, in short, no "clear rule of law or professional responsibility, or ... matter of public policy necessitates that the [subrogation] should not be enforced." *New Hampshire Ins. Co. Inc.*, 429 Mass. at 210–11, 707 N.E.2d at 336.

### 2. *Statute of Limitations Argument*

■ Svensson also argues that St. Paul's legal malpractice claim is barred by the statute of limitations. # 72 at 15. Svensson argues that the statute of limitations began to run in August, 1996, when Neogen first filed suit, immediately after Vicam sent out its "Dear Valued Customer Letter." St. Paul argues that the statute of limitations began to run at the earliest in January, 2000, when the Florida court issued its summary judgment ruling. # 85 at 12. Alternatively, St. Paul argues that the statute of limitations was tolled under the doctrines of continuing representation, and fraudulent misrepresentation. Because the parties do not dispute the rele-

vant facts bearing on this issue, the critical question before the Court is when St. Paul's cause of action for legal misrepresentation accrued. For the reasons set out below, the Court determines that St. Paul's cause of action is not time-barred.

■ The Massachusetts statute of limitations for a legal malpractice claim is three years. Mass. Gen. L. c. 260, § 2A. St. Paul bears the burden of establishing that its claim is timely. *See Riley v. Presnell*, 409 Mass. 239, 243–44, 565 N.E.2d 780, 785 (Mass.1991) (citation omitted). Under Massachusetts law, a malpractice claim accrues and the limitations period begins to run "once [a] client or former client knows or reasonably should know that he or she has sustained appreciable harm as a result of the lawyer's conduct ...." *Rosen Constr. Ventures, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, 364 F.3d 399, 405 (1st Cir. 2004) (*quoting Williams v. Ely*, 423 Mass. 467, 473, 668 N.E.2d 799 (1996)). In other words, Massachusetts requires that "a plaintiff have (1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was." *Bowen v. Eli Lilly & Co., Inc.*, 408 Mass. 204, 208, 557 N.E.2d 739 (1990), quoted in *Rosen Constr. Ventures, Inc.*, 364 F.3d at 405. The Court must ask whether Vicam had sufficient "notice of a causal relationship between the harmful event attributed to the defendant ... and the harm suffered by the plaintiff." *Eck v. Kellem*, 51 Mass.App.Ct. 850, 853, 748 N.E.2d 1047, 1050 (Mass.App.Ct.), *rev. denied*, 435 Mass. 1103, 758 N.E.2d 144 (Mass.2001) (citations omitted). *See also Bowen*, 408 Mass. at 207, 557 N.E.2d 739 (stating that "[t]he important point is that the statute of limitations starts to run when an event or events have occurred that were reasonably likely to put the

plaintiff on notice that someone may have caused her injury.")

In this case, the parties seem to be in substantial agreement that Vicam suffered harm when Neogen filed suit, and Vicam was forced to defend that suit. *See, e.g., Mass. Elec. Co. v. Fletcher, Tilton & Whipple, P.C.,* 394 Mass. 265, 268, 475 N.E.2d 390, 392 (Mass.1985) (harm is sustained when plaintiff must expend additional legal fees as a result of attorney's alleged malpractice). *See also Rosen Constr. Ventures, Inc.,* 364 F.3d at 405. Rather, the determinative inquiry in this case involves the question of causation: Did Vicam realize that the alleged malpractice caused the harm when Neogen filed suit in August, 1996, or when the Florida court issued its summary judgment determination in January, 2000?

St. Paul argues that Vicam could not reasonably have known that Svensson's alleged malpractice caused it harm at the time that Neogen filed suit in large part because Svensson repeatedly assured Vicam that Neogen's suit was baseless. The evidence suggests that both Svensson and Radlo believed that Neogen had a history of aggressiveness in the market. St. Paul maintains that Vicam, relying on Svensson's assurances that Neogen's suit was meritless, agreed with Svensson that Neogen's actions were that of an overly aggressive competitor. Svensson had told Radlo that he thought there was a "low chance" of Neogen filing suit and that "that would be a pretty aggressive move on Neogen's part." # 87, Exh.1 at 1:194. Thus, at the time of Neogen's suit, St. Paul argues that Vicam attributed the cause of its harm to Neogen, not to a failure on Svensson's part to advise him of the risks in sending the letter. St. Paul argues that it was only when the judgment was entered in favor of Neogen that Vicam could

have known that Svensson's advice itself caused Vicam's harm. # 85 at 12, 14.

Svensson, in turn, argues that Vicam should reasonably have known that the alleged malpractice—the advice to send the letter—caused Neogen to file suit. At base, he argues that because Neogen filed suit within 36 hours of sending the letter, Vicam should have known *ipso facto* that Svensson's alleged malpractice caused Vicam's harm. Svensson argues that "no particular sophistication or insight into legal mysteries," # 72 at 21 n. 46, would have been required to identify the connection in fact between Svensson's advice and Neogen's lawsuit.

Svensson's argument fails under both the facts of this case and Massachusetts law. First, all the evidence suggests that at the time that Neogen filed its lawsuit, both Radlo and Svensson believed that Neogen was acting aggressively in filing what Svensson maintained was a meritless case. Further, Radlo's affidavit asserts that "he had no idea that anything [Svensson and Sweeney] had done was responsible for the Neogen suit", # 87, Exh. 8 ¶ 2, that Svensson told him Neogen's suit was meritless, *id.* ¶ 3, and that he "had no reason to question" that advice. *Id.* Svensson has offered no additional evidence to dispute the facts that suggest that, at the time of Neogen's lawsuit, Vicam never questioned Svensson's advice or that Vicam should reasonably have attributed the Neogen lawsuit to Neogen's aggressive business tactics, and not to Svensson's advice. There is, for example, no evidence to suggest that Vicam was dissatisfied with Svensson's services or sought a second opinion on the Neogen litigation. *Cf. Cantu v. St. Paul Companies,* 401 Mass. 53, 58, 514 N.E.2d 666, 669 (Mass. 1987) (hiring of second attorney to investigate first suggests plaintiff had questions about first attorney's representation.) To

the contrary, the Court notes that Vicam continued to use Svensson and BSKB even after the Neogen dispute was resolved. # 87, Exh. 3 at 1:94–95.

■■■ For that reason, the facts of this case implicate the "continuing representation" doctrine, which tolled the statute of limitations as long as Svensson continued to represent Vicam. *See, e.g., Cantu,* 401 Mass. at 58, 514 N.E.2d at 669. Under that doctrine, "a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered." *Cantu,* 401 Mass. at 58, 514 N.E.2d at 669 (citations omitted). As noted above, the evidence here supports St. Paul's contention that Vicam, in the face of Svensson's and Sweeney's repeated assurances, continued innocently to rely on Svensson's repeated assurances.

Instead, Svensson argues that the continuing representation doctrine does not apply here because Vicam *actually* knew that Svensson's alleged malpractice caused it harm. *See, e.g., Lyons v. Nutt,* 436 Mass. 244, 250, 763 N.E.2d 1065, 1070 (Mass.2002) (doctrine does not apply when a client "actually knows that he suffered appreciable harm as a result of his attorney's conduct.") Svensson makes essentially two attempts to establish that Vicam had "actual knowledge" of the alleged malpractice. First, Svensson urges the Court to impute "actual knowledge" to Vicam simply by dint of Neogen filing its suit so quickly after Vicam sent out the "Dear Valued Customer Letter." But because Svensson himself continued to maintain that his advice to send the letter was proper, and because Svensson represented to Vicam that Neogen's suit was without merit, the Court is hard-pressed to see

how Vicam should be charged with recognizing at the time of the lawsuit that Svensson's advice might be wrong. *See Williams v. Ely,* 423 Mass. 467, 476–77, 668 N.E.2d 799, 806 (Mass.1996) (refusing to impute legal expertise to client in order to establish that client should have recognized tax liability); *Hendrickson v. Sears,* 365 Mass. 83, 90, 310 N.E.2d 131, 135 (1974) (stating that "[t]he client is not an expert; he cannot be expected to recognize professional negligence if he sees it, and he should not be expected to watch over the professional or to retain a second professional to do so.") Moreover, Radlo asserted in his affidavit that "he had no idea that anything [Svensson] had done was responsible for the Neogen suit." # 87, Exh. 8 ¶ 2. *Cf. Lyons,* 436 Mass. at 248, 763 N.E.2d at 1069 (finding that client's admission in deposition that defendant law firm "didn't know what they were doing" was sufficient to demonstrate "actual knowledge").

■■■ Second, Svensson argues that Vicam had "actual knowledge" of the alleged malpractice because Vicam indisputably knew that it began to incur legal expenses for unplanned litigation in August, 1996. Svensson relies for this argument on the proposition, noted above, that "harm" occurs under Massachusetts law when a client expends " 'additional legal fees to ameliorate the harm caused by [his attorney's] error.' " *Rosen Construction Ventures, Inc.,* 364 F.3d at 405 (*quoting Levin v. Berley,* 728 F.2d 551, 554 (1st Cir.1984)) (and cases cited). But that proposition states only half the equation; it does not answer the "causation component of the accrual analysis." *Id.* The statute of limitations is not triggered under Massachusetts law merely because a client knew he was incurring additional legal fees; the client must know that he or she is incurring those fees *because of* the alleged mal-

practice. Put another way, there must be a "necessary coalescence of discovery and appreciable harm." [8] *Cantu*, 401 Mass. at 57, 514 N.E.2d at 668–669.

The controlling cases here are *Eck v. Kellem*, 51 Mass.App.Ct., 850, 748 N.E.2d 1047 (Mass.App.Ct.2001), *rev. denied*, 435 Mass. 1103, 758 N.E.2d 144 (Mass.2001) and *Rosen Constr. Ventures, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, 364 F.3d 399 (1st Cir.2004). In *Eck*, the plaintiff's attorney drafted a purchase and sale agreement and assured his client, the seller of the property, that the agreement would protect him from any liability for hazardous waste discovered on the property. The buyer later sued the client. The attorney, though not representing the client in the suit, continued to assure his client and his client's new attorney that the sale agreement would protect the client from liability. His advice proved wrong. The court found that the judgment against the client and not the filing of the lawsuit itself triggered the statute of limitations because it was only then that the attorney's `assurances of success proved wrong.

Relying on *Eck*, the First Circuit recently addressed in detail the arguments presented here in *Rosen Construction Ventures, Inc.* There, the defendant law firm ("Mintz") had drafted an agreement intended to protect its client Rosen's interests in a piece of property owned by O'Donnell, the other party to the agreement. Later, Rosen was forced to sue O'Donnell for what he and Mintz considered to be O'Donnell's breach of the agreement. Mintz assured Rosen that the original agreement would protect his interests, and that Rosen would prevail in his lawsuit. *Rosen Construction Ventures, Inc.*, 364 F.3d at 406. Because Mintz refused to take the case on contingency, Rosen hired another firm to represent him in his lawsuit, although Mintz admitted that it worked with the new firm in its efforts to resolve the dispute. *Id.*

Under those facts, the First Circuit conducted a two-part inquiry. First, it established that harm had occurred because the client had expended " 'additional legal fees to ameliorate the harm caused by [his original attorney's] error.' " *Id.* at 405 (*quoting Levin v. Berley*, 728 F.2d 551, 554 (1st Cir.1984)). The Court then noted that "[t]he critical inquiry here is when Rosen knew, or reasonably should have known, that Mintz's alleged malpractice, and not O'Donnell's purported breach, was the cause of Rosen's harm." *Id.* (*citing

---

**8.** In most of the cases on which Svensson relies, "discovery" was not at issue, as it is here. *See, e.g., Mass. Elec. Co. v. Fletcher, Tilton & Whipple*, 394 Mass. 265, 475 N.E.2d 390 (Mass.1985) (client learned of malpractice immediately, but suffered harm only later when suit was filed against it based on attorney's malpractice); *Cantu*, 401 Mass. at 57, 514 N.E.2d at 668 (client discovered attorney malpractice when excess insurer informed him that client's attorney had failed to give timely notice; "harm" occurred only later when client hired a second attorney to advise him on liability that original attorney caused in failing to give notice.) In these cases, then, there was no question that the client had knowledge of the alleged malpractice, but it was only later, when harm occurred in the form of hiring a second attorney, or defending against suit, that discovery and harm coalesced. *Salin v. Shalgian*, 18 Mass.App.Ct. 467, 467 N.E.2d 475 (Mass.App.Ct.), *rev. denied*, 393 Mass. 1102, 469 N.E.2d 830 (Mass. 1984) is somewhat different. In *Salin*, the plaintiff's attorney had negligently certified the title to real estate. The statute of limitations began to run on the legal malpractice claim when the plaintiff's neighbor filed suit. It was only in answering the complaint that the "[t]he alleged defects in the certified title were no longer 'inherently unknowable' ", *id.* at 469–70, 467 N.E.2d at 477 (*quoting Hendrickson*, 365 Mass. at 90, 310 N.E.2d at 136), and the plaintiff was deemed to have sufficient notice that her attorney had erred.

*Williams*, 423 Mass. at 473, 668 N.E.2d 799.) The Court concluded that the continuing representation doctrine applied, and rejected Mintz's various arguments to charge Rosen with actual knowledge of Mintz's alleged malpractice. The Court observed:

> "[A]s the facts of this case demonstrate, if a lawsuit has been filed that implicates the work of their lawyer, the outcome of that lawsuit may be highly relevant to a critical question in the accrual analysis-whether the clients should have known that their lawyers, rather than their adversaries, were responsible for the harm caused by the legal problem at issue in the lawsuit."

*Rosen Constr. Ventures, Inc.*, 364 F.3d at 413.

Under *Eck* and *Rosen Constr. Ventures, Inc.*, the Court concludes that Vicam had no actual knowledge of Svensson's alleged malpractice in August, 1996, and that, in the face of Svensson's assurances, the earliest that Vicam reasonably should have known that Svensson's alleged malpractice caused its harm was January 2000. Further, the doctrine of continuing representation applies here to toll the statute of limitations as long as Svensson represented Vicam.[9] Thus, St. Paul filed this suit well within the statute of limitations.

### 3. Argument on Attorney Malpractice and Duty of Care

██ Count I of the complaint asserts a claim for legal malpractice against Svensson. St. Paul contends that Svensson was negligent in advising Vicam, *inter alia,*

that it could properly send the "Dear Valued Customer Letter," and in failing to advise Vicam that sending the letter could expose Vicam to tort liability. # 1 ¶ 20. Svensson has admitted that he drafted the letter and that he advised Radlo and Vicam that they could properly send the letter. # 2 ¶ 20. Svensson argues that summary judgment is appropriate because, as a matter of law, he had no duty to advise Vicam not to send the "Dear Valued Customer Letter." His argument is this: Svensson knew when he advised Vicam to send the letter that federal patent law protects a patent holder who makes a public accusation of infringement, even if the accusation is later proved wrong, if the patent holder has a good faith belief that the patent was being infringed. All parties to this suit agree that Vicam was acting in "good faith" when it sent the letter to Neogen. Svensson did not advise Vicam that a finding of "bad faith" in sending the letter could lead to substantial liability because he knew that Vicam was protected by this federal privilege. In light of the federal privilege, Neogen's claims were meritless. Thus, Svensson had no duty to warn that sending the "Dear Valued Customer Letter" might provoke a meritless lawsuit.

██ This argument fails under both the facts of the case and the law. By framing the issue as he has, Svensson attempts to narrow the scope of his obligations under Massachusetts law. In Massachusetts, "an attorney owes his or her client a duty to exercise a reasonable

---

**9.** Svensson argues that because he did not represent Vicam in the Neogen dispute and instead turned the matter over to his partner, Sweeney, the continuing representation doctrine does not apply. The Court rejects Svensson's effort to draw this fine distinction. First, the Court can reasonably infer that Svensson continued to advise his own partner on the suit for which his own legal advice formed the basis. Second, the evidence shows that Vicam continued to retain Svensson even after the Neogen litigation. Finally, the First Circuit concluded in *Rosen Constr. Ventures, Inc., supra,* that the continuing representation doctrine applied even though Mintz was not actually litigating the lawsuit, but continued to work with the litigator in resolving the dispute. *Id.* at 406.

degree of care and skill in the performance of legal tasks." *Sierra Fria Corp. v. Donald J. Evans, P.C.*, 127 F.3d 175, 179 (1st Cir.1997) (and cases cited.) Svensson's obligations are more properly stated as follows:

> [W]hen a client seeks advice from an attorney, the attorney owes the client 'a duty of full and fair disclosure of facts material to the client's interests.' *Williams v. Ely*, 423 Mass. 467, 668 N.E.2d 799, 806 (1996). This means that the attorney must advise the client of any significant legal risks involved in a contemplated transaction, and must do so in terms sufficiently plain to permit the client to assess both the risks and their potential impact on his situation. Consequently, in a legal malpractice action that implicates an attorney's performance of his counseling function, the trier of fact must determine whether the attorney's advice permitted the client adequately to weigh the risks involved in a given course of action. *See id.*

*Sierra Fria Corp.*, 127 F.3d at 179–80.

St. Paul complains that Svensson breached this duty by advising Vicam that it was proper to send the letter without also advising Vicam about the attendant risks. It is undisputed that Svensson did not advise Vicam of its liability exposure if the accusation of infringement could be deemed to have been in "bad faith." # 88 at 2 ¶ 2. Although the record suggests that Svensson informed Vicam of the need to confirm the kind of antibodies Neogen was using, # 87, Exh. 2 at 1:130, there is no evidence in the record that Svensson made plain to Vicam that failing to establish with some certainty the type of antibody Neogen was using could lead a reasonable juror to conclude that Vicam was acting in bad faith. *Id.* at 129–131. St. Paul's expert, Harry Manbeck, has expressed the opinion that a reasonable patent attorney in Svensson's position should have, among other things, advised Vicam that sending the "Dear Valued Customer Letter" could expose Vicam to tort liability if Neogen could establish that the letter was sent in "bad faith." # 88 at 4. These facts are enough to establish a genuine issue of material fact on this issue. At bottom, the questions Svensson poses-whether a finding of "bad faith" was a significant risk under the circumstances, and whether Svensson's advice would have permitted Vicam "adequately to weigh the risks" in sending the letter-are matters for the parties' experts to debate and for a jury to resolve. As such, they are wholly incompatible with summary disposition.

Furthermore, Svensson's argument rests on a disputed premise: namely, that Neogen's claims were meritless. Svensson makes much in his argument of the fact that St. Paul has admitted that Vicam held a subjective good faith belief that Neogen's product infringed its patent. St. Paul's admission to that effect does not compel summary judgment on this issue. St. Paul is not the ultimate arbiter of the question of whether Vicam acted in "bad faith," and its opinion or admission on the matter is without legal consequence. The question of "bad faith" was the factual controversy in the underlying litigation, and the Florida court ruled that it was a triable issue. In other words, the Court finds no inconsistency in St. Paul holding the position that Vicam might have sent the "Dear Valued Customer Letter" in subjective good faith, and its claim that a reasonable factfinder could, on the basis of the facts of the case, find otherwise.

Finally, Svensson cites to a number of cases which, he contends, stand for the proposition that a lawyer has no duty to anticipate and avoid a nonmeritorious defense. # 72 at 13–14 & nn. 20–23. The Court has reviewed those cases and notes

that in each case, the attorney's allegedly negligent advice was later proved correct by a judicial ruling. *See, e.g., Simko v. Blake,* 201 Mich.App. 191, 506 N.W.2d 258 (1993), *aff'd,* 448 Mich. 648, 532 N.W.2d 842 (1995) (lower court's ruling reversed and attorney's advice proved correct on appeal); *Bush v. O'Connor,* 58 Wash.App. 138, 791 P.2d 915 (1990), *rev. denied,* 115 Wash.2d 1020, 802 P.2d 125 (1990) (attorney's choice-of-law advice proved correct in judicial determination, and in later state Supreme Court ruling). Here, however, the Florida court ruled that the question of whether Vicam acted in "bad faith" is one for the jury. Despite Svensson's conclusions to the contrary, the Court has no basis for concluding that Neogen's claims were without merit, and instead concludes that St. Paul, through its expert's affidavit, has successfully pointed to a dispute of fact on this matter.

### C. Sweeney's Motion for Summary Judgment

In Count II of its Complaint, St. Paul alleges that Sweeney was negligent in his representation of Vicam during the Florida litigation. # 1 ¶ 48. During the course of the litigation, Sweeney represented to the Florida trial court that Vicam and Radlo would not waive the attorney-client privilege, and would not offer evidence at trial about the advice that Svensson (or anyone else at BSKB) had given to Radlo. # 1 ¶ 30. Thus. Vicam was unable to assert an advice-of-counsel defense to counter Neogen's assertion that Vicam had acted in bad faith in sending the "Dear Valued Customer Letter." St. Paul's expert opines that a jury could have found that Vicam had acted in bad faith under the facts of the case, and that the advice-of-counsel defense would have been critical to success. # 88 at 11. Without the defense, St. Paul argues, Vicam had no choice but to settle as it did.

Sweeney moves for summary judgment only on the question of causation, arguing that St. Paul will be unable to establish that Sweeney's alleged negligence in failing to assert the advice-of-counsel defense caused Vicam's loss. The parties dispute the question of whether St. Paul or Sweeney will bear the burden of proof on the issue of causation. The Court determines that Massachusetts law requires Sweeney to bear the burden of proof on proximate cause, and thus, for the reasons set out below, the Court denies Sweeney's motion for summary judgment.

To establish legal malpractice in Massachusetts, a plaintiff generally must establish: "(1) the existence of an attorney-client relationship; (2) that [the] attorney breached his duty to exercise reasonable care and skill; (3) that the plaintiff suffered actual loss; and (4) that the attorney's negligence proximately caused such loss." *Cain v. Kramer,* 2002 WL 229694, at *8 (D.Mass.2002) (citations omitted). Once the plaintiff has established negligence, the causation issue is decided by conducting a "trial within a trial." *Id.* (and cases cited). If the malpractice plaintiff was the plaintiff in the underlying action, the plaintiff must establish that he "probably would have obtained a better result had the attorney exercised adequate skill and care." *Fishman v. Brooks,* 396 Mass. 643, 647, 487 N.E.2d 1377, 1380 (Mass.1986) (citation omitted). *See also Glidden v. Terranova,* 12 Mass.App.Ct. 597, 600, 427 N.E.2d 1169, 1171 (Mass.App. Ct.1981) (same). When the malpractice plaintiff was the defendant in the underlying action, as here, and the plaintiff is claiming that the attorney failed to put on a competent defense, the burden shifts to the defendant attorney to establish that, "despite his negligence, the same outcome would have eventuated." *Cain,* 2002 WL 229694, at *10 (*quoting Wagenmann v.*

*Adams,* 829 F.2d 196, 221 n. 17 (1st Cir. 1987)). *See also Glidden,* 12 Mass.App.Ct. at 600, 427 N.E.2d at 1171 (stating that when defendant attorney allegedly fails to defend in underlying litigation, attorney bears the burden of proof on causation); *Deerfield Plastics Co., Inc. v. Hartford Ins. Co.,* 404 Mass. 484, 486, 536 N.E.2d 322, 324 (Mass.1989) (in action alleging insurer had negligently settled claim, once insured produced evidence of negligence, insurer had burden of proving that insured sustained no loss as a result of insurer's negligence).

In a rather contorted argument, Sweeney argues that this line of cases does not apply here. In Sweeney's view, all the cases above place the burden on the attorney defendant to establish that the malpractice plaintiff would have *lost* the underlying litigation. *See, e.g., Cain,* 2002 WL 229694, at *10. Sweeney argues that his position, unlike that in the cited cases, is that Vicam would have *won* the underlying litigation even without the advice-of-counsel defense. For that reason, Sweeney maintains that the burden should shift back to St. Paul on the causation issue because St. Paul's position is aligned with Neogen's on the causation question. Therefore, Sweeney theorizes, "St. Paul would bear the burden of proving everything Neogen would have been required to show in order for the victory St. Paul envisions to have occurred." Mem. in Support of Def. Sweeney's Motion for Summary Judgment, #74 at 13–14. The Court rejects the argument that Sweeney's theory of the case ought to determine the burden of proof. Nothing in Massachusetts case law suggests that this sort of burden shifting is either warranted or appropriate. Under Massachusetts law, Sweeney bears the burden of proving that his alleged malpractice did not cause Vicam's loss. *Deerfield Plastics Co., Inc. v.*

*Hartford Ins. Co.,* 404 Mass. 484, 486 & n. 3, 536 N.E.2d 322, 324 & n. 3.

Sweeney makes an additional argument on the causation issue. The Court can deal with this argument in short order because it fails for the reasons noted above, and under other principles of Massachusetts law. Sweeney argues that Murphy's role in the litigation as co-counsel dictates that, under agency principles, St. Paul, as Murphy's employer, must be deemed to have ratified Sweeney's litigation strategy. Thus, Sweeney's argument goes, St. Paul will be unable to establish that Sweeney alone negligently failed to assert the advice-of-counsel, and so St. Paul cannot establish that Sweeney alone caused Vicam's harm.

First, as noted, Sweeney bears the burden of proof on causation. Second, under Massachusetts law,

'[s]ince the conduct of the litigation is the responsibility of trial counsel, the insurer is not vicariously liable for the negligence of the attorneys who conduct the defense for the insured.' 7C J.A. Appleman, Insurance Law and Practice § 4687, at 192–193 (rev. ed.) Rule 5.4(c) of the Massachusetts Rules of Professional Conduct, as appearing in 430 Mass. 1303 (1999), states: 'A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.' As such, a lawyer hired by an insurer to represent an insured owes an unqualified duty of loyalty to the insured and must act at all times to protect the insured's interests. [citation omitted.] It is the lawyer who controls the strategy, the conduct and daily details of the defense.

*Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.,* 439 Mass. 387, 408–9, 788 N.E.2d 522, 540 (Mass.2003).

Sweeney argues that this rule does not apply here because Murphy was St. Paul's staff counsel, or employee, and not an independent contractor. The Court disagrees. The language of Rule 5.4(c) specifically mentions the employment context. The rationale underpinning the rule applies as forcefully to the case of staff counsel for the insurer as it does to the case of counsel that an insurer has retained as an independent contractor. Furthermore, St. Paul has offered affirmative evidence that Sweeney made the decision not to assert the advice-of-counsel defense by himself and that he did not consult with Vicam, Murphy or St. Paul on the matter. # 88 at 7 ¶ 10.

Because the Court determines that Sweeney bears the burden of proof on causation, and because St. Paul must only present evidence to defeat summary judgment on which it bears the ultimate burden of proof, *Mesnick,* 950 F.2d at 822, the Court denies Sweeney's motion for summary judgment.

## IV. CONCLUSION AND ORDER

For all the reasons set out above, it is ORDERED that Svensson's and Sweeney's motions for summary judgment (## 71 & 73) be, and the same hereby are, DENIED. A conference to set a trial date shall be scheduled.