Ambrose C. MENDES, Jr., et al.

v.

Alfred FACTOR et al.

No. 2010–171–Appeal.

Supreme Court of Rhode Island.

April 17, 2012.

Thomas L. Mirza, Esq., for Plaintiff.

Robert M. Brady, Esq., East Providence, for Defendant Alfred Factor.

Joseph F. Penza, Jr., Esq., Warwick, for Defendant Kirshenbaum & Kirshenbaum.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The plaintiffs, Ambrose C. Mendes, Jr., Victor Mendes, and Madonna Mendes,[1] appeal from a Superior Court judgment in favor of the defendants, Alfred Factor and Kirshenbaum & Kirshenbaum Attorneys at Law, Inc. (K & K). The judgment was entered after a hearing justice issued an order granting the defendants' motions to dismiss both the plaintiffs' probate appeal and their verified complaint alleging breach of fiduciary duty and negligence. For the reasons set forth in this opinion, we affirm the judgment to the extent that it dismissed Victor and Madonna's probate appeal and the plaintiffs' verified complaint, but we vacate the judgment insofar as it dismissed Ambrose's probate appeal.

## I

### Facts and Procedural History

The following facts have been taken from plaintiffs' verified complaint and from

---

1. Ms. Mendes's first name is spelled incorrectly in the case captions and the transcript. For accuracy's sake, we will use the spelling, "Madonna," as it appears in the majority of the Superior Court pleadings. Additionally, we will refer to the plaintiffs by their first names for purposes of clarity only; no disrespect is intended.

various Superior Court and Probate Court documents in the record.[2] The plaintiffs' father, Ambrose C. Mendes, Sr. (Ambrose, Sr. or decedent), executed his "Last Will and Testament" (will) on February 3, 1976. Under the terms of the will, Rufino Mauricio[3] and Alfred Factor were appointed as coexecutors, and in the event of Factor's death or impediment, Isidore Kirshenbaum was named as his replacement coexecutor. The will also placed all of decedent's property in a trust, with the exception of his home. Mauricio was named as trustee, Factor was named as successor trustee, and Kirshenbaum was named as Factor's successor trustee. The will granted the trustee full authority to "manage and control the trust estate."

The trust was to be held "for the benefit of [decedent's] three children * * *, namely, Ambrose * * *, Madonna and Victor," and the net income from the trust was to be paid to, and distributed equally between, the three children until the youngest child turned thirty years old. Specifically, the will expressly directed that when the youngest child reached the age of thirty, the "[t]rust shall terminate, and the trust fund hereby created then in the hands of said trustee or his successor, shall be and become the absolute property of [decedent's] said children * * * in equal shares."

Ambrose, Sr., died on September 30, 1976, and his estate was opened in the Providence Probate Court the same year. Ambrose, Madonna, and Victor "are the sole surviving heirs and children of [decedent]." Upon his death, decedent was the principal of Intersection Realty Inc. (Intersection Realty), which owned twenty-three parcels of real estate.[4] One such property was located at 70 Camp Street in Providence and housed the business known as the Mendes Funeral Home, Inc. (Mendes Funeral Home).

The plaintiffs alleged in their verified complaint that decedent, prior to his death, had directed Factor and K & K to transfer his ownership of both Intersection Realty and the Mendes Funeral Home to his three children. They further alleged that on September 27, 1976, "documents of ownership"[5] and bank documents, which had been prepared by Factor and notarized by Mauricio, were to be submitted to the Office of the Secretary of State "for validation"; however, according to plaintiffs, this task was never accomplished.

The plaintiffs further alleged that, on May 27, 1977, without notifying the Mendes children, Mauricio and Factor conducted a meeting at which they appointed Factor as president, treasurer, and secretary of Intersection Realty. The first accounting filed by these coexecutors on December 4, 1979, listed fifty-five shares of Intersection Realty with a value of $276,148, a "received to date" amount of $570,404.58, payouts in the amount of $293,198.61, and a remaining balance of $277,205.97. This first accounting was ap-

2. The plaintiffs' allegations in the verified complaint were accepted by the hearing justice as being true for the purposes of the motions to dismiss; thus, although defendants, in their brief, note their disagreement with a number of these allegations, they do not dispute their validity for the purposes of this appeal.

3. Mr. Mauricio died in 2006.

4. In March 1976, prior to decedent's death, an appraisal of all his property was conducted, and the fair market value was estimated to be $340,700.

5. These documents listed decedent as president of Intersection Realty and the Mendes Funeral Home. They also listed Ambrose as vice president, Victor as secretary, and Madonna as treasurer of both companies.

proved by the Probate Court on September 8, 1981.

The plaintiffs, in the verified complaint, contended that defendants sold the land and building on which the Mendes Funeral Home sat, but did not sell the actual business in conjunction with the sale of the real estate. The plaintiffs further alleged that between February 3, 1976, and May 1987, defendants sold many of Intersection Realty's properties below their fair market value, failed to maintain insurance on the properties in their care, failed to take "reasonable and prudent steps to maintain and preserve the properties," and failed to pay taxes on many of the properties, allowing them to be sold at tax sales. Although the will called for the coexecutors to create a trust, then to terminate the trust and distribute its assets equally among the three Mendes children when the youngest Mendes child attained the age of thirty, plaintiffs averred that the coexecutors failed to ever create such a trust. The plaintiffs also alleged that Factor, who was employed by and associated with K & K, "continued to act in some legal capacity, either as fiduciary of Ambrose [Sr.'s] estate, officer of Intersection Realty [or] attorney for the [Mendes children] after April 2, 1981." Additionally, plaintiffs purported that Factor continued to sell Intersection Realty properties after this date and that K & K received commissions from these sales.

The Providence Probate Court docket sheet shows no entries regarding the estate from June 2, 1987, until September 8, 2008, at which time the docket sheet reflects that Factor filed an amended second accounting[6] and also a third and final accounting. On September 18, 2008, the three beneficiaries of the Mendes estate objected to the entry of these accountings, and they subsequently sought a hearing in the Probate Court on the accountings' validity. As a result of this action, a consent order pursuant to G.L.1956 § 33–23–1(f)[7] was entered by the Probate Court on March 3, 2009.

In the consent order, the parties conceded that the issues that were presented to the Probate Court could not be resolved there, stipulated to an appeal to the Superior Court, agreed to numerous facts, declared the issues that would "form the basis of the appeal," and acquiesced that neither party would be precluded "from raising additional claims or defenses" on appeal. The issues, as stated in the consent order, were as follows:

"a) Whether the fiduciary breached his duties to the beneficiaries of the estate;

"b) Whether the second and third accountings were properly allowed by the [P]robate [C]ourt;

"c) Whether the executors had the authority to sell any assets of Intersection Realty Inc.;

"d) If the executors did have the authority to sell the assets of Intersection Realty Inc., what monies, if any have not been accounted for in the Estate of Ambrose Mendes."

Also on March 3, 2009, a claim of appeal was filed in the Probate Court, which stated:

---

**6.** Factor originally filed a second accounting on November 12, 1981, but that action never was approved by the court.

**7.** Both the consent order and the claim of appeal, which were filed on the same day, list G.L.1956 " § 33–23–1(3)(f)" as the applicable statute. It seems, however, that this was a typographical error by the Probate Court, and the statute instead should have been listed as § 33–23–1(f). We will refer to the Probate Court's use of the statute as § 33–23–1(f) in this opinion for clarity and correctness.

"The undersigned, a party in interest, is aggrieved by an order or decree entered on: March 3, 2009[.] * * * [P]ursuant to [§ 33–23–1(3)(f) ] the parties presented, and the [c]ourt entered a [c]onsent [o]rder stipulating to certain facts and the necessity of an appeal. [A]nd in consequence thereof and as a result claim an appeal from said order or decree to the Superior Court for said County and request a certified copy of said claim and the record of the proceedings appealed from."

The only plaintiff to sign the claim of appeal was Ambrose.

On March 31, 2009, the three Mendes children filed a verified complaint in the Superior Court alleging breach of fiduciary duty and negligence. Specifically, the breach-of-fiduciary-duty claim alleged that defendants "breached said duty by failing to transfer [decedent's] interests in Intersection Realty" to plaintiffs "at any time prior to or after [their father's] death." The complaint further contended that defendants failed to collect rents from the real estate properties, to account for rents that had been collected, to pay taxes that became due, or to "otherwise manage the said real estate property." The complaint also alleged that defendants failed "to sell the properties properly or in a commercially reasonable manner, or for their fair value," "to pay the operating expenses of the assets," which allowed those properties "to become tax delinquent" and be subject to tax sales, and "to properly account for and/or disburse to the [p]laintiffs for any and all money received." The negligence claims listed in the verified complaint alleged that defendants breached a duty of care owed to plaintiffs by allowing the previously mentioned acts to occur.

The defendants subsequently filed separate motions to dismiss the probate appeal, both contending that plaintiffs had failed to perfect their appeal for two reasons: first, because Victor and Madonna had not filed an appeal in accordance with § 33–23–1(a)(1),[8] and second, because Ambrose had failed to comply with the provisions of § 33–23–1(a)(2) in filing his appeal.[9] Additionally, defendants moved to dismiss the verified complaint under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure on the grounds that the statute of limitations had expired.

A hearing on defendants' motions to dismiss was held on January 5, 2010, and on January 15, 2010, the hearing justice granted the motions and dismissed both the probate appeal and the verified complaint. An order reflecting the hearing justice's bench decision and a judgment in favor of defendants were entered on January 20, 2010. The plaintiffs subsequently

8. Section 33–23–1(a)(1) states:

"Any person aggrieved by an order or decree of a [P]robate [C]ourt (hereinafter "appellant"), may, unless provisions be made to the contrary, appeal to the [S]uperior [C]ourt for the county in which the [P]robate [C]ourt is established, by taking the following procedure:

"(1) Within twenty (20) days after execution of the order or decree by the [P]robate judge, the appellant shall file in the office of the clerk of the [P]robate [C]ourt a claim of appeal to the [S]uperior [C]ourt and a request for a certified copy of the claim and the record of the proceedings appealed from, and shall pay the clerk his or her fees therefor."

9. Section 33–23–1(a)(2) states:

"Within thirty (30) days after the entry of the order or decree, the appellant shall file in the [S]uperior [C]ourt a certified copy of the claim and record and the reasons of appeal specifically stated, to which reasons the appellant shall be restricted, unless, for cause shown, and with or without terms, the [S]uperior [C]ourt shall allow amendments and additions thereto."

filed an appeal to this Court on February 5, 2010.[10]

## II

## Standard of Review

Rule 81(a)(1) of the Superior Court Rules of Civil Procedure states that the said rules "do not apply during the process and pleading stages to * * * [p]robate appeals." Nevertheless, this Court previously has indicated that the same standard that applies to a Rule 12(b)(6) motion to dismiss will apply to a motion to dismiss a probate appeal. *Pettis v. Cuddy*, 828 A.2d 521, 522 (R.I.2003) (mem.).

 "In reviewing the grant of a motion to dismiss pursuant to Rule 12(b)(6), this Court applies the same standard as the hearing justice." *Barrette v. Yakavonis*, 966 A.2d 1231, 1233 (R.I.2009). "Because 'the sole function of a motion to dismiss is to test the sufficiency of the complaint,' our review is confined to the four corners of that pleading." *Id.* at 1234 (quoting *Palazzo v. Alves*, 944 A.2d 144, 149 (R.I.2008)). A motion to dismiss is properly granted "when it is clear beyond a reasonable doubt that the plaintiff would not be entitled to relief from the defendant under any set of facts that could be proven in support of the plaintiff's claim." *Id.* (quoting *Palazzo*, 944 A.2d at 149–50).

---

**10.** Although the notice of appeal identified all three plaintiffs as the parties filing the appeal, only one filing fee was tendered within the twenty-day period prescribed by Article I, Rule 4(a) of the Supreme Court Rules of Appellate Procedure. Two additional filing fees were paid, however, following a prebriefing conference on March 15, 2011. As the appeal clearly was timely filed by one plaintiff, and defendants have not challenged the late payment by the remaining two plaintiffs, we deem the appeal to be properly before us as to all three plaintiffs.

## III

## Discussion

On appeal, plaintiffs first challenge the hearing justice's conclusion that their probate appeal was not perfected. They argue that the hearing justice erred by concluding that Victor and Madonna failed to take an appeal from the consent order entered by the Probate Court. The plaintiffs also contend that the hearing justice erred by holding that the probate appeal was not perfected because plaintiffs did not file their reasons of appeal. Finally, plaintiffs challenge the hearing justice's dismissal of their verified complaint, arguing that his determination that their complaint was barred by the statute of limitations was in error.

### A

### The Probate Court Appeal

#### 1

#### Signatories to the Claim of Appeal

On appeal, plaintiffs challenge the hearing justice's conclusion that Victor and Madonna failed to perfect their appeals in the Superior Court because their signatures were not included on the claim of appeal. The plaintiffs argue that their appeal to the Superior Court complied with the procedural requirements of § 33–23–1(a)(1) because it was filed under § 33–23–1(f).[11]

---

**11.** Section 33–23–1(f) states:

"Nothing in this chapter shall preclude interested parties in a probate proceeding from stipulating to a probate appeal from the [P]robate [C]ourt to the [S]uperior [C]ourt and toward that end to build a record by agreed statement of facts and otherwise, to fashion on a form of order or decree to preserve or frame issues as the parties desire, and to preserve the status quo ante pending appeal through custodianship of assets or otherwise. Such a stipulated probate appeal shall be governed by

To support their argument, plaintiffs point out that the Probate Court judge suggested the use of a consent order pursuant to § 33–23–1(f) to stipulate to an appeal to the Superior Court and that all of the parties, including Victor and Madonna, worked together to determine the contents of the consent order. The plaintiffs assert that because the consent order was attached to the claim of appeal at the time it was filed and because it referred to "the parties" (specifically naming Ambrose, Victor, and Madonna as decedent's three beneficiaries), all three Mendes children should be considered appellants in the appeal to the Superior Court.[12] The defendants argue, however, that because Ambrose was the only signatory on the claim of appeal, he was the only plaintiff to appropriately file it. As a result, defendants contend that the appeal does not include Victor or Madonna.

■ Section 33–23–1(a) sets forth the requirements for filing a claim of appeal from the Probate Court to the Superior Court. However, § 33–23–1(f) states that "[n]othing in this chapter shall preclude interested parties in a probate proceeding from stipulating to a probate appeal from the [P]robate [C]ourt to the [S]uperior [C]ourt," and it also directs that "[s]uch a stipulated probate appeal shall be governed by and be subject to the procedural requirements of this chapter." Section 33–23–1(a) further states that "*[a]ny person* aggrieved by an order or decree of a [P]robate [C]ourt * * * may * * * appeal to the [S]uperior [C]ourt" by following the procedure laid out in the same section. (Emphasis added.) This clearly means that any individual, out of the number of all individuals aggrieved by a Probate Court order, has the authority to file an appeal, but is not required to do so. We agree with the hearing justice that the only party that satisfied the requirements of § 33–23–1(a)(1), namely, the requirement to file a claim of appeal, was Ambrose. Accordingly, we hold that he was the only plaintiff to properly file an appeal in the Superior Court.

2

**Reasons for Appeal**

The plaintiffs also argue that the claim of appeal was perfected pursuant to § 33–23–1(a)(2), which requires the "reasons of appeal" to be "specifically stated" and filed in the Superior Court within thirty days after the entry of the Probate Court order being appealed from. They assert that the appeal was a stipulation among all of the parties, including the Mendes children and Factor, to appeal their case to the Superior Court under § 33–23–1(f). The plaintiffs additionally point out that the consent order was filed contemporaneously with the notice of appeal and that the notice of appeal specifically listed the issues that formed the basis for the appeal; thus, plaintiffs contend that the requirement of § 33–23–1(a)(2)—to file the reasons of appeal—was satisfied.

The plaintiffs also argue that the purpose and process of § 33–23–1(f) is "clear and unambiguous"—that "[i]t provides a mechanism to construct the case in a clear and concise format before the matter is transferred to the [S]uperior [C]ourt." Although conceding that there may be an ambiguity with the statute's use of the

and be subject to the procedural requirements of this chapter."

12. The consent order states that "[t]he parties herein agree to and stipulate that this matter be appealed to the Providence County Superior Court pursuant to [§ 33–23–1(f) ]," and that they further "agree that the issues pending before the Providence Probate Court, as enumerated herein, cannot and will not be resolved in the Providence Probate Court."

word "issues" in § 33–23–1(f) ("to fashion on a form of order or decree to preserve or frame *issues* as the parties desire" (emphasis added)), in contrast to the word "reasons" in § 33–23–1(a)(2) ("the appellant shall file * * * the *reasons* of appeal specifically stated" (emphasis added)), plaintiffs propose that the two terms, as used within § 33–23–1, are interchangeable. As such, plaintiffs argue that for this Court "to conclude [that] these terms have different meanings within the statute as a whole would render [§ 33–23–1(f) ] incomplete and potentially contradictory."

The defendants counter that the mere fact that a consent order was involved in this case does not excuse plaintiffs from adhering to the procedural requirements of § 33–23–1(a)(2). To support their contention, they point to the last sentence of § 33–23–1(f), which states: "[A] stipulated probate appeal shall be governed by and be subject to the procedural requirements of this chapter." The defendants argue that this sentence "mandates that the procedural requirements in connection with appealing a [P]robate [C]ourt order need to be followed whenever a consent order has been entered."

 "[Q]uestions of statutory construction are reviewed *de novo* by this Court." *Generation Realty, LLC v. Catanzaro,* 21 A.3d 253, 258 (R.I.2011). "When construing a statute, 'our ultimate goal is to give effect to the purpose of the act as intended by the Legislature.'" *Id.* at 259 (quoting *D'Amico v. Johnston Partners,* 866 A.2d 1222, 1224 (R.I.2005)). "We must 'determin[e] and effectuat[e] that legislative intent and attribut[e] to the enactment the most consistent meaning.'" *Id.* (quoting *Ryan v. City of Providence,* 11 A.3d 68, 71 (R.I.2011)). "When the language of the statute is clear and unambiguous, it is our responsibility to give the words of the enactment their plain and

ordinary meaning." *Id.* (quoting *Kulawas v. Rhode Island Hospital,* 994 A.2d 649, 652 (R.I.2010)).

 "The plain meaning approach, however, 'is not the equivalent of myopic literalism,' and 'it is entirely proper for us to look to the sense and meaning fairly deducible from the context.'" *Generation Realty, LLC,* 21 A.3d at 259 (quoting *In re Brown,* 903 A.2d 147, 150 (R.I.2006)). "Therefore, we must 'consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections.'" *Id.* (quoting *Sorenson v. Colibri Corp.,* 650 A.2d 125, 128 (R.I.1994)). "Finally, under no circumstances will this Court 'construe a statute to reach an absurd result.'" *Id.* (quoting *Kaya v. Partington,* 681 A.2d 256, 261 (R.I.1996)).

 We are of the opinion that, although § 33–23–1(f) does not excuse an appellant from the procedural requirements listed elsewhere in the statute, "a form of order or decree [that] preserve[s] or frame[s] issues as the parties desire" and that is created for the express purpose of stipulating to a probate appeal under § 33–23–1(f), satisfies the requirement of § 33–23–1(a)(2)—that the appellant file "the reasons of appeal" in the Superior Court. The purpose of requiring a party to file the reasons of appeal is, first, to provide notice to the opposing party of what is at issue, and second, to restrict the appellant during his or her appeal to only the issues listed within the reasons for appeal. *See Cannon v. McEnanley,* 21 R.I. 60, 62, 41 A. 1016, 1017 (1898) (stating that "[t]he purpose of the reasons of appeal is to notify the adverse party of the grounds of appeal, that such party may be apprised of what he is to meet at the trial"); *see also* § 33–23–1(a)(2) (stating that appellant "shall be restricted" to his

or her reasons of appeal). Clearly, the consent order in this case, in which the parties stipulated to the appeal and framed the issues that were to "form the basis of the appeal to the Superior Court," was sufficient to provide notice and to confine the appeal to those enumerated issues. The consent order was referred within and attached to the claim of appeal when it was filed in the Probate Court, and there is no dispute that it was filed within the thirty-day time limitation of § 33–23–1(a)(2). Thus, we are satisfied that the appeal was perfected under § 33–23–1(a), at least as to Ambrose.

## B

### The Verified Complaint

The plaintiffs additionally challenge the hearing justice's dismissal of their verified complaint, arguing that the hearing justice's determination that their complaint was barred by the statute of limitations constitutes error. The hearing justice held that plaintiffs' allegation of breach of fiduciary duty was barred by the ten-year statute of limitations dealing with civil actions, namely, G.L.1956 § 9–1–13(a),[13] and that their negligence claims were barred by the three-year limitation for legal malpractice, as set forth in § 9–1–14.3.[14] On appeal, plaintiffs attempt to forestall the death knell for their claims by raising two related theories: the continuous course of conduct theory and the continuing representation doctrine. It is our opinion, however, that neither theory can revive their long-moribund allegations.

This Court has held that a statute-of-limitations defense may be raised under

Rule 12(b)(6), "provid[ed that] the alleged timing defect appears on the face of the complaint." *Martin v. Howard,* 784 A.2d 291, 297 (R.I.2001). "In reviewing a [Superior Court] justice's grant of a motion to dismiss pursuant to Rule 12(b)(6), this Court assumes the allegations contained in the complaint to be true and views the facts in the light most favorable to the plaintiffs." *Id.* at 297–98 (quoting *St. James Condominium Association v. Lokey,* 676 A.2d 1343, 1346 (R.I.1996)). "This Court has cautioned that such a motion should not be granted 'unless it appears to a certainty that [the plaintiffs] will not be entitled to relief under any set of facts which might be proved in support of [their] claim.'" *Id.* at 298 (quoting *Lokey,* 676 A.2d at 1346).

In the case at bar, the hearing justice held that:

"[T]he majority of allegations of mismanagement and breach of fiduciary duties stem from actions and omissions occurring within the time period beginning from the opening of the estate in 1976 and Factor's last act as co-executor in 1987.

"Because the statute of limitations for legal malpractice actions commences upon occurrence of the incident which gave rise to the action not upon the last act as plaintiffs contend[,] [t]he plaintiffs' claims against both [K & K] and Factor must fail if considered as a separate action. Even if the plaintiffs were not initially aware of the injuries sustained as a result of the alleged malpractice, plaintiffs certainly were aware of the facts that would place a reasonable

---

13. General Laws 1956 § 9–1–13(a) states: "Except as otherwise specially provided, all civil actions shall be commenced within ten (10) years next after the cause of action shall accrue, and not after."

14. Section 9–1–14.3 states, in pertinent part: "[A]n action for legal malpractice shall be commenced within three (3) years of the occurrence of the incident which gave rise to the action."

person on notice that a potential claim existed once the co-executors allegedly took over Intersection [Realty] and began selling properties."

The hearing justice further determined that, regardless of whether the three-year statute of limitations for a legal malpractice claim or the ten-year statute of limitations for civil actions claiming a breach of fiduciary duty applied in this case, "the time [in] which the plaintiffs could have brought the claim stemming from the alleged mismanagement of the estate ha[d] expired."

 Our review of plaintiffs' verified complaint leads us to the same conclusion. All the facts set forth in the complaint that plaintiffs use to support their allegations of breach of fiduciary duty and negligence allegedly occurred between February 3, 1976, and May 1987. Although the complaint asserts that Factor "continued to act in some legal capacity, either as fiduciary of [the] estate, officer of Intersection Realty [or] attorney for the [p]laintiffs" and that he presented an amended second, and third and final accounting in 2008, it does not refer to any specific wrongful conduct by him after 1987. Consequently, plaintiffs' claim of breach of fiduciary duty is barred by the ten-year statute of limitations set forth in § 9–1–13(a), and their malpractice allegations are barred by the three-year limitation period set forth in § 9–1–14.3.

### 1

### Continuing Course of Conduct Doctrine

On appeal, plaintiffs argue that both § 9–1–13 and § 9–1–14.3 were tolled under the "continuing course of conduct theory." The plaintiffs allege that their claims against defendants "stem from [defendants'] mismanagement and breach of fiduciary duties as co-executors, and attorneys for the co-executors of [decedent's estate]," and because Factor "continues as the executor today," defendants' fiduciary duties to plaintiffs still exist. In an attempt to keep their claims alive, plaintiffs point to a theory developed by Connecticut courts in cases where there is an ongoing relationship between the parties. The plaintiffs specifically cite to *Giulietti v. Giulietti,* 65 Conn.App. 813, 784 A.2d 905 (2001), in which the Appellate Court of Connecticut explained:

"The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied.... [T]he doctrine is generally applicable under circumstances where [i]t may be impossible to pinpoint the exact date of a particular negligent act or omission that caused injury or where the negligence consists of a series of acts or omissions and it is appropriate to allow the course of [action] to terminate before allowing the repose section of the statute of limitations to run...." *Id.* at 925–26 (quoting *Sanborn v. Greenwald* [39 Conn.App. 289] 664 A.2d 803, 807 (Conn.App.Ct. 1995)).

 The plaintiffs argue that their case is "analogous to the facts and circumstances" of *Giulietti,*[15] because, like the

**15.** In *Giulietti v. Giulietti,* 65 Conn.App. 813, 784 A.2d 905, 926 (2001), the son of the plaintiffs, who was providing "legal representation and services for his family's business," was found to have "committed an initial wrong" when he first erred in preparing a deed for his father, and then again, when he later drafted subsequent deeds. The court held that although the son's actions transpired "more than three years before [his parents] filed the fraud and malpractice action against [him], there exist[ed] both a spe-

defendant in that case, defendants here had a fiduciary duty to plaintiffs that continued for many years—at least from 1976 until March 2008. According to plaintiffs, their relationship with defendants should toll the statute of limitations because of Factor's "failure to present a Second and/or Final Accounting." As such, plaintiffs contend, "the nature and scope of the allegations against [defendants] were not actionable in the Superior Court until such time as the Probate Court lost jurisdiction or [defendants] ceased in their roles as co-executors and attorneys for the co-executors" because "[d]amages could not be ascertained with the requisite specificity until the accountings were presented." However, this Court has not adopted the continuing course of conduct doctrine, and we decline to do so in the context of this case.

### 2

### Continuing Representation Doctrine

The plaintiffs additionally argue that § 9–1–13(a) and § 9–1–14.3 were tolled under the continuing representation doctrine. The plaintiffs allege that Factor, as executor of the estate, and K & K, as attorneys for the executor, "had an ongoing fiduciary duty with and to [plaintiffs] at least until the time Factor presented the Second and Third and Final Accountings to the Probate Court in September 2008." They further contend that the "executor/beneficiary relationship is analogous to an attorney/client relationship." To support their argument, plaintiffs cite to *Feddersen v. Garvey*, 427 F.3d 108 (1st Cir.2005), an appeal to the United States Court of Appeals for the First Circuit in a New Hampshire case, in which, according to plaintiffs, the First Circuit applied the continuing representation doctrine to an attorney-client relationship.

The First Circuit, in *Feddersen*, stated that "[i]n jurisdictions where [the continuing representation doctrine] applies, that doctrine, which 'recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith,' * * * 'tolls the statute of limitations while the defendant attorney [in a malpractice case] continues to represent the plaintiff.'" *Feddersen*, 427 F.3d at 114 (quoting *Greene v. Greene*, 56 N.Y.2d 86, 451 N.Y.S.2d 46, 436 N.E.2d 496, 500 (1982) and *Rosen Construction Ventures, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, 364 F.3d 399, 406 (1st Cir.2004)). The First Circuit, however, held that the plaintiff's "continuing representation argument fail[ed] because New Hampshire has not adopted the doctrine." *Id.* Even if we were to adopt this doctrine in this case, it would not apply because defendants' allegedly actionable conduct occurred more than twenty years before plaintiffs filed suit and was well known to plaintiffs at the time.

### 3

### Discovery Rule Exception

We do recognize in Rhode Island an exception to the strict application of the statute of limitations in legal malpractice cases known as the "discovery rule," which is set forth in § 9–1–14.3(2).[16] The plain-

---

cial relationship between the parties and later wrongful omissions relating back to the prior wrongful acts alleged by the plaintiffs so as to trigger the [continuing course of conduct] doctrine." *Id.*

**16.** Section 9–1–14.3(2) states:

"In respect to those injuries due to acts of legal malpractice which could not in the exercise of reasonable diligence be discoverable at the time of the occurrence of the incident which gave rise to the action, suit shall be commenced within three (3) years

tiffs concede that the statutory period under the discovery rule begins to run when a plaintiff "becomes aware of facts[,] or by exercising reasonable diligence could [have] discover[ed] facts that would place a reasonable person on notice that a potential claim exists." Nonetheless, plaintiffs contend that their "hands were tied so long as [defendants] were allowed to continue to manage the estate." Further, plaintiffs allege that "[t]he true nature and scope of the causes of action did not become sufficiently clear to [them] until 2008."

This Court has held that "[t]he discovery-rule exception serves 'to protect individuals suffering from latent or undiscoverable injuries who then seek legal redress after the statute of limitations has expired for a particular claim.'" *Sharkey v. Prescott*, 19 A.3d 62, 66 (R.I.2011) (quoting *Canavan v. Lovett, Schefrin and Harnett*, 862 A.2d 778, 783 (R.I.2004)). We also have stated that "[t]he standard applied to this exception is objective: it 'requires only that the plaintiff be aware of facts that would place a reasonable person on notice that a potential claim exists.'" *Id.* (quoting *Canavan*, 862 A.2d at 784).

■ In the plaintiffs' verified complaint, they alleged that the defendants failed to transfer decedent's interests in Intersection Realty to the plaintiffs "on or about September 27, 1976"; that the defendants "sold many of [Intersection Realty's] properties below fair market value" between February 3, 1976, and May 1987; that the defendants "collected or should have collected rents on Intersection Realty properties" between June 1977, and May 1987; that the defendants failed to pay

taxes on many of these properties between June 1977, and May 1987; that the defendants "failed to ever create a trust" or distribute the trust assets when Victor attained the age of thirty on April 2, 1981; and that the defendants "failed to properly account for and/or disburse to the [p]laintiffs for any and all money received." Each and every allegation that the plaintiffs relied upon and listed in their complaint was an act that they were aware of on or before 1987.[17] We are satisfied that the plaintiffs' hands were not "tied" until the submission of the final accounting to determine "[t]he true nature and scope of the causes of action." Therefore, we find that the discovery-rule exception to the statute of limitations does not apply, and consequently, we are satisfied that both the allegations of breach of fiduciary duty and legal malpractice, as set forth in the plaintiffs' verified complaint, are barred by the statute of limitations.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment to the extent that it dismissed Victor and Madonna's probate appeal and the plaintiffs' verified complaint, but we vacate the judgment insofar as it dismissed Ambrose's probate appeal. The record of the case shall be remanded to the Superior Court for further proceedings consistent with this opinion.

---

of the time that the act or acts of legal malpractice should, in the exercise of reasonable diligence, have been discovered."

**17.** The plaintiffs state in their brief that in 1980 they filed a motion in Probate Court to remove Factor as executor, and, when that effort failed, they filed a complaint against him with the Chief Disciplinary Counsel.